921 F.2d 1438
 1991-1 Trade Cases 69,317
 Alexandre B. TODOROV, M.D., individually and Neurology
Clinic P.C., an Alabama Professional Corporation,
Plaintiffs-Appellants,
v.
DCH HEALTHCARE AUTHORITY; The Radiology Clinic; William A.
Askew; William A. Askew, M.D., P.C.; William A.
Bright; and John G. Kahler, Defendants-Appellees.
 No. 89-7569.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 29, 1991.
 
 J. Paul Whitehurst, Tuscaloosa, Ala., for plaintiffs-appellants.
 Michael S. Burroughs, Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, Ala., for Radiology Clinic, Wm. A. Bright, John G. Kahler, Wm. A. Askew and Wm. A. Askew, M.D., PC.
 William J. Donald, Donald, Randall, Donald & Hamner, William J. Donald, III, Tuscaloosa, Ala., for DCH Healthcare Authority.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge, and ESCHBACH*, Senior Circuit Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 This is an appeal from a grant of summary judgment. Two questions are presented: first, whether a hospital and the radiologists on its medical staff, for the purpose of preventing competition for the provision of radiological services at the hospital, denied a neurologist the privilege to perform a procedure in the hospital's radiology department in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1-2 (1988); and, second, whether, in refusing to grant the neurologist this privilege, the hospital denied him due process of law. We find no antitrust violations or denial of due process, and accordingly affirm.
 
 I.
 A.
 
 2
 DCH Regional Medical Center (DCH) is a general hospital in Tuscaloosa, Alabama; it is the largest hospital in the area. Dr. Alexandre Todorov is a member of DCH's medical staff, having been granted privileges to practice neurology.[1] Soon after DCH granted him these privileges, Dr. Todorov applied for the privilege to perform a procedure in the hospital's radiology department: the administration and interpretation of CT scans of the head.
 
 
 3
 A CT scan is a diagnostic procedure used to produce a series of cross-section images of internal body parts.[2] The key component of a CT scan machine is a computer that is able to manipulate data received from a rotating x-ray beam, reproduce an image onto a video display, and print the image onto film. DCH maintains the equipment for administering CT scans in its radiology department.
 
 
 4
 The decision to have a CT scan performed is made primarily by the patient's treating physician. The treating physician refers his patient to the radiology department where a radiology technician, who is an employee of the hospital, administers the procedure under the direction and supervision of a radiologist. Before a patient receives a CT scan at DCH, the radiologist overseeing the administration of the scan must make several decisions concerning the procedure. These decisions are made after consultation with the referring physician[3] and the patient, and a review of the patient's medical records.
 
 
 5
 The radiologist must decide how large the x-ray sections (or "slices") will be, whether the sections will be overlapped, how many sections to scan, and whether to use contrast. Contrast is a liquid that is injected into the area to be scanned; CT scans performed with contrast are more sensitive, creating more detailed images.[4] In addition, the radiologist must decide how to position the patient for the CT scan; for CT scans of the head, the patient's head is angled in different manners to capture different parts of the brain.
 
 
 6
 The radiologists at DCH have developed several standardized approaches to administering CT scans known as "protocols"; these are directions that inform the radiology technicians how to position the patient, how many sections to scan, how large the sections should be, and whether to use contrast. The radiologists generally recommend one of their established protocols for a CT scan procedure instead of writing extensive instructions to the technician.
 
 
 7
 After the scan is administered, the radiologist examines the film produced to determine whether additional scans will be needed to capture more information.[5] Once the radiologist is satisfied that the film is adequate for its diagnostic purpose, he interprets the film for the patient's treating physician.
 
 
 8
 The radiologist also makes a report for the hospital; DCH is required by the Alabama State Board of Health to maintain complete and accurate medical records for every patient at the hospital. Ala.Admin.Code r. 420-5-7.07(3) (1988) (Rules of Alabama State Board of Health).[6] The radiologist's report describes the CT scan that was administered and includes the radiologist's interpretation of the CT scan film--the "official" interpretation.
 
 
 9
 The radiologist charges his patient one fee for his role in administering the CT scan and making the official interpretation; if the patient is insured, the radiologist usually collects his fee from the patient's insurance company. The radiologist's charge is separate from the hospital's charge.
 
 
 10
 As a practicing neurologist, Dr. Todorov frequently relies on CT scans of the head to diagnose his patients' ailments; he refers many of his patients to DCH for the procedure. After a patient's head has been scanned and the film has been produced and officially interpreted, Todorov usually examines the film himself. He has difficulty, however, collecting a fee from his patients' insurance companies for the examination; most insurance companies will pay but one fee for a CT scan interpretation and that fee goes to the radiologist who makes the official interpretation. Thus, in practice, Todorov bills his patients only for his neurological services. If he were privileged to administer and officially interpret CT scans in DCH's radiology department, though, he might be able to collect the fees that otherwise would go to the radiologists. To solve his problem, Dr. Todorov applied for such privileges at DCH. DCH, however, denied his application. This denial is the subject of the dispute in this case.
 
 B.
 
 11
 According to the bylaws of DCH's medical staff (as promulgated by the hospital's board of directors), when a physician seeks privileges, including additional privileges, at DCH, he fills out an application and submits it to the hospital's administrator. The administrator, in turn, refers the application to the credentials committee, which is composed of members of the hospital's medical staff. The credentials committee then asks the chairman of the hospital's department in which the applicant wishes to practice medicine for a recommendation. The credentials committee also contacts the applicant's references, if any, for their views on the applicant's suitability for the privileges in question.
 
 
 12
 After considering the opinions of these references and the department chairman, the credentials committee makes a recommendation and submits it to the hospital's administrator and to the executive committee of the medical staff. If both committees recommend that the requested privileges be granted, the administrator forwards their recommendations to the hospital's board of directors. If either committee recommends that the requested privileges be denied, the administrator notifies the applicant and the applicant can appeal to the Hearing Panel, which is composed of members of the medical staff, and request a hearing. At the hearing, the applicant may present the testimony of witnesses and exhibits. The Hearing Panel, after considering all of the evidence in the case, then recommends that the requested privileges be granted or denied and forwards its decision to the credentials committee for further consideration by that committee.
 
 
 13
 The credentials committee, in turn, reconsiders the application and issues a new recommendation, which it sends, as before, to the hospital's administrator and the medical staff's executive committee. If both committees recommend that privileges be granted, the administrator forwards their recommendations to the hospital's board of directors. If, once again, either committee recommends that privileges be denied, the administrator notifies the applicant and the applicant can appeal to the Appellate Review Panel, which is composed of "reputable persons" selected by the chairman of the hospital's board of directors. To support his appeal, the applicant may submit a written statement and, at the panel's discretion, present additional evidence on his suitability for the requested privileges. The panel then decides whether to recommend that such privileges be granted and forwards its decision to the board of directors. The board may "affirm, modify or reverse the recommendation of the [Appellate] Review Panel or, in its discretion, refer the matter for further review and recommendation."[7]
 
 C.
 
 14
 In this case, Dr. Todorov filed the proper application and the hospital administrator referred his application to the credentials committee, pursuant to the medical staff bylaws. This committee sought recommendations from the two physicians Dr. Todorov had named as references. Both are radiologists who practice at DCH: Dr. John G. Kahler, a member of the credentials committee and one of the appellees, and Dr. Ronald Phelps. In a letter accompanying his application, Dr. Todorov stated that these physicians would attest to his competence to read CT scans of the head. They did not, however, recommend Dr. Todorov for privileges; instead, they stated that they had not worked with him in interpreting CT scans and they questioned his ability to administer CT scans. The credentials committee also sought the advice of the chairman of DCH's radiology department, Dr. William A. Bright, also an appellee. Bright recommended that Dr. Todorov's application for additional privileges be denied. Given these responses--from Dr. Todorov's references and the department chairman--the credentials committee concluded, with Dr. Kahler abstaining, that Dr. Todorov had not adequately documented his competence to perform the procedures for which he had requested privileges, and it therefore recommended that his application be denied.
 
 
 15
 Dr. Todorov appealed this decision to the Hearing Panel. This panel found, after a hearing at which Dr. Todorov argued his case, that Dr. Todorov was competent to perform the procedures at issue. The panel then submitted its finding to the credentials committee; that committee concurred in the panel's finding and, in turn, forwarded its concurrence to the executive committee of the medical staff. Although the credentials committee concurred in the Hearing Panel's finding, it did not recommend that Dr. Todorov's application be granted; rather, the committee took no position on the issue.
 
 
 16
 The executive committee, after receiving the credentials committee report, held a brief hearing, heard from Dr. Todorov, and then forwarded its recommendation that Dr. Todorov's application be denied to the hospital's board of directors. The executive committee made this recommendation because it did not want to establish a precedent of granting radiology privileges to nonradiologists. The committee feared that if Dr. Todorov were granted the privilege of administering and officially interpreting CT scans of the head, other nonradiologists would seek, and would likely be granted, the same or other privileges in the radiology department, and the department's operations--especially the scheduling of radiological procedures--could become chaotic. This, in time, might cause the staff radiologists to leave the hospital. Additionally, the committee feared that a non-hospital-based physician, like Dr. Todorov, would have difficulty complying with the hospital's requirement that a report be filed in the hospital's medical records for the patient within twenty-four hours after a CT scan procedure is completed. Since the hospital needed to fulfill this requirement to comply with the Board of Health's regulations, see supra p. 1442 & note 6, this was an important concern.
 
 
 17
 After he received notice of the executive committee's decision, Dr. Todorov requested and received a review of this decision by the Appellate Review Panel. That panel convened a hearing on the matter and heard the arguments of both Dr. Todorov and his attorney. The panel then recommended to the hospital's board of directors that Dr. Todorov's application be denied. On July 9, 1985, the board, accepting the reasons given by the executive committee for its recommendation, denied Dr. Todorov's application for privileges.
 
 D.
 
 18
 Following the board's rejection of his application, Dr. Todorov brought this suit against DCH; three members of its medical staff, Drs. William A. Bright, John G. Kahler, and William A. Askew; and their professional partnership (consisting of twelve radiologists), The Radiology Clinic. (We refer to these physicians and their partnership, collectively, as the radiologists.) As noted, Dr. Bright is chairman of DCH's radiology department. Drs. Kahler and Askew hold privileges in the department; in addition, Dr. Kahler is a member of the credentials committee and Dr. Askew is a member of the executive committee of DCH's medical staff.
 
 
 19
 Dr. Todorov framed his complaint in five counts. Three of them are pertinent here.[8] Count one claimed that the defendants had violated section 1 of the Sherman Act[9] in two ways and sought treble damages and injunctive relief under sections 4 and 16 of the Clayton Act.[10] First, Dr. Todorov alleged that the radiologists, for the purpose of lessening the competition for radiological services at DCH and thus enhancing their earning potential, conspired with one another to keep Dr. Todorov from obtaining privileges in the radiology department. These physicians could not achieve this objective, according to Dr. Todorov, unless DCH's board of directors went along with their plan; therefore, they enlisted the board's help. The board, with full knowledge of the physicians' plan, agreed to help and joined their conspiracy. Second, Dr. Todorov claimed that the defendants had violated section 1 by conspiring, for the purposes described above, to have DCH tie the services of the radiologists to its sale of CT scans. Dr. Todorov alleged that in order to obtain a CT scan at DCH, a patient had to hire a physician in DCH's radiology department to interpret the scan.
 
 
 20
 Count two claimed that the defendants had violated section 2 of the Sherman Act[11] and sought the same relief as count one. In this count, Dr. Todorov alleged that the radiologists had monopolized the market for interpreting CT scans of the head and that, in an effort to maintain this monopoly, they had DCH's board of directors deny his application for privileges. According to Dr. Todorov, the board knew of the radiologists' plan at the time it was considering his application and denied the application so that the plan could succeed; the board, therefore, became a coconspirator of these physicians and violated section 2. Dr. Todorov also alleged that DCH's board denied his application for privileges to further DCH's monopoly in the market for the provision of CT scans of the head.
 
 
 21
 Count three, brought under 42 U.S.C. Sec. 1983 (1988),[12] claimed that DCH, in processing Dr. Todorov's application, had denied Dr. Todorov substantive and procedural due process of law, in violation of the fourteenth amendment, in several respects. For example, the radiologists participated in the consideration of Dr. Todorov's application although they had a financial stake in the outcome of the application process; consequently, they were partial decisionmakers. In addition, the standards used to determine whether he should be granted privileges were vague or nonexistent; this rendered the board of directors' decision arbitrary and capricious. Finally, he alleged that the medical staff committees, the Hearing Panel, the Appellate Review Panel, and the board of directors failed to give him a fair hearing. To remedy this denial of due process, Dr. Todorov sought injunctive relief--in the form of an order directing DCH to grant him the requested privileges--and damages.
 
 
 22
 DCH, in its answer to Dr. Todorov's complaint, denied that it had conspired with the radiologists as alleged. DCH also claimed that it was immune from liability to Dr. Todorov under the state action doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. The radiologists, in their answer, also denied the existence of the alleged conspiracy.
 
 
 23
 Following extensive discovery, DCH and the radiologists each moved for summary judgment. The district court granted their motions. The court, applying the state action doctrine, held that DCH was immune from antitrust liability because it is a local governmental entity and, in processing and denying Dr. Todorov's application for privileges, was acting pursuant to state authority. The court held that the radiologists were immune from antitrust liability because the illegal conduct they were accused of constituted the lobbying of a local government, a first amendment activity protected by the Noerr -Pennington doctrine. See United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The court held, alternatively, that if these physicians were not engaged in lobbying, then they were acting as employees of DCH and, as such, enjoyed DCH's immunity. For these reasons, the court concluded, Dr. Todorov could not recover under counts one and two of his complaint. With respect to count three, the court held that Dr. Todorov had no protected liberty or property interest in his application for additional privileges; therefore, he had no claim under the due process clause of the fourteenth amendment. Alternatively, the court held that even if Dr. Todorov did have a protected liberty or property interest, DCH, in processing his application, did not deny him due process of law.
 
 E.
 
 24
 Dr. Todorov now appeals, contending that the district court misapplied the law--on all three counts--in granting summary judgment. Had the court properly applied the law, he contends, it would have concluded that genuine issues of material fact remain to be litigated and that summary judgment could not lie.
 
 
 25
 We disagree. We find that Dr. Todorov has suffered no antitrust injury as a result of the alleged violations of sections 1 and 2 of the Sherman Act and thus hold that Dr. Todorov has no standing under sections 4 and 16 of the Clayton Act to prosecute these claims. Alternatively, assuming that Dr. Todorov has standing to prosecute these antitrust claims, we hold that the district court properly granted the defendants summary judgment on both counts. First, with respect to Dr. Todorov's count one claim under section 1 of the Sherman Act, the record demonstrates no conspiracy involving DCH and the radiologists; rather, the denial of the privileges Dr. Todorov requested constituted a unilateral act on the part of DCH. Thus, there is no case under section 1 against any of the appellees. Second, with respect to Dr. Todorov's count two claim under section 2 of the Sherman Act, we hold that DCH is immune from section 2 liability under the state action doctrine;[13] as for the radiologists, there is no proof that they caused Dr. Todorov any injury.[14] Finally, as for Dr. Todorov's count three claim, we agree with the district court that he has no case under the due process clause of the fourteenth amendment.
 
 II.
 
 26
 We organize our discussion of Dr. Todorov's claims as follows. First, we address his standing to bring an action under sections 4 and 16 of the Clayton Act for the alleged violations of sections 1 and 2 of the Sherman Act. Second, assuming Dr. Todorov has standing to prosecute these antitrust claims, we address their merits. Finally, we turn to Dr. Todorov's claims under the due process clause of the fourteenth amendment.
 
 
 27
 Before conducting an examination of Dr. Todorov's claims under the antitrust laws, we briefly explain the economic operation of the market at issue. As stated earlier, a patient receives two separate charges after having a CT scan performed at DCH. First, the patient is charged by DCH for the provision of the CT scan; this charge represents a return on DCH's investment in the CT scan machine and the expenses it incurs for labor and materials used in producing the CT scan film. Second, the patient is charged by the radiologist who supervises the CT scan; this charge represents a fee for his services in administering the CT scan and interpreting the film.
 
 
 28
 DCH has an interest in attracting as many patients as it can for CT scans; the radiologists, however, may not share this general interest. The radiologists make up the entire radiology staffs at both DCH and West Alabama General Hospital, DCH's only competitor for CT scan service in the Tuscaloosa area. Because of this, the radiologists, while interested in attracting more referrals to themselves, may be indifferent as to which hospital the patients use for CT scan service; no matter which hospital the patients choose, the radiologists get a fee.
 
 
 29
 Patients usually come to DCH's radiology department for CT scans because their treating physicians send them there. These referred patients fall into two categories: inpatients and outpatients. Inpatients are patients who are admitted into the hospital for treatment; outpatients are patients who are treated in the hospital's dispensary or clinic instead of a room or ward. DCH's inpatients are "captive" consumers of its radiology department in that these patients, if they require radiological procedures as part of their treatment while in the hospital, use DCH's service within the hospital; neither they nor their treating physicians shop around the market. Thus, to attract more inpatients to its radiology department, DCH must work to make itself more attractive overall to consumers--for example, it might lower the room rate, improve the facilities, or attract more physicians to DCH so that they use DCH to care for their patients. Outpatients, on the other hand, are generally not captive consumers; they are captive only if their physicians insist on sending them to DCH for treatment and they always follow their physicians' advice. Assuming that these consumers are not captive, DCH will act to attract outpatients in ways different from those used to attract inpatients. To create more demand among outpatients for its services, DCH, in addition to improving the hospital generally, might lower the total price patients pay for CT scans. This would attract business to DCH at the expense of the more costly hospital, West Alabama General. Indeed, given the similarities between the radiology staffs and equipment of DCH and West Alabama General, price may be the best way for these hospitals to compete in the market for CT scans of the head.
 
 
 30
 DCH can lower the total price patients pay for CT scans by lowering the price it charges, the price the radiologists charge, or both. DCH, of course, would prefer that the price reduction came out of the radiologists' pockets and not out of its own coffers. As stated above, the radiologists make up the radiology staffs at both DCH and West Alabama General; thus, these physicians dominate the radiology market in the Tuscaloosa area. Accordingly, they may be charging patients a monopoly price, as Dr. Todorov alleges. If DCH fostered competition among its staff radiologists by giving other physicians, like Dr. Todorov, privileges in its radiology department, the price charged by the radiologists at DCH for CT scan services would decrease; the price would move to the competitive price. This, in turn, would lower the total cost to patients for CT scans and would give DCH an advantage over its competitor if its competitor was still saddled with a monopoly in its radiology department. Thus, DCH would benefit by fostering competition among the physicians in its radiology department; in fact, DCH would be able to increase the price it charges for its services as long as it kept the total cost to the patient below its competitor's total price.
 
 
 31
 Of course, this case arises because DCH denied Dr. Todorov's application for privileges. There is a dispute as to why Dr. Todorov was denied privileges and whether this action was illegal. With the above discussion in mind, we now analyze Dr. Todorov's claims.
 
 A.
 
 32
 The first question we must address is whether Dr. Todorov has standing to prosecute the antitrust claims in this case. The question of standing is one of law. Austin v. Blue Cross & Blue Shield, 903 F.2d 1385, 1387 (11th Cir.1990). In order to determine whether a plaintiff has standing to bring an antitrust action, a court must examine the allegations contained in the complaint. Id.; Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539, 547 (5th Cir.1980), cert. denied, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).[15] First, however, it is necessary to understand the standing requirement for antitrust cases brought under sections 4 and 16 of the Clayton Act. See supra note 10.
 
 
 33
 Standing in an antitrust case involves more than the "case or controversy" requirement that drives constitutional standing. See Flast v. Cohen, 392 U.S. 83, 94-101, 88 S.Ct. 1942, 1949-53, 20 L.Ed.2d 947 (1968). Thus, antitrust standing is not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws. Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983); Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1493 (11th Cir.1985), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); County of Oakland v. City of Detroit, 866 F.2d 839, 852 (6th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3235, 3236, 111 L.Ed.2d 747 (1990). Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws, see, e.g., Cargill, Inc. v. Monfort, Inc., 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986).
 
 
 34
 Section 4 of the Clayton Act, which authorizes suits for treble damages, broadly states that "any person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. Sec. 15(a). The federal courts, however, have not interpreted section 4 as expansively as its literal language suggests. In Associated General, the leading case on antitrust standing, the Supreme Court discussed the limitations on antitrust recovery that were recognized by Congress when it passed section 7 of the Sherman Act, the predecessor section whose language section 4 incorporated and adopted. These limitations included common-law tort concepts such as proximate cause, directness of injury, and certainty of damages. Associated General, 459 U.S. at 529-35, 103 S.Ct. at 904-07. This historical analysis led the Court to conclude that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Id. at 534, 103 S.Ct. at 906 (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 891-92 n. 14, 31 L.Ed.2d 184 (1972)); see also Blue Shield v. McCready, 457 U.S. 465, 476-77, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). Thus, the Court fashioned an approach for analyzing antitrust standing that requires us to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Associated General, 459 U.S. at 535, 103 S.Ct. at 907. The reason for the standing limitation in antitrust cases brought under section 4 is to avoid overdeterrence resulting from the use of the somewhat draconian treble-damage award; by restricting the availability of private antitrust actions to certain parties, we ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability.
 
 
 35
 The Supreme Court, along with the lower federal courts, has long struggled to develop a precise test to determine whether a particular plaintiff is the proper party to bring an antitrust suit under section 4 of the Clayton Act;[16] in truth, "[t]he issue of antitrust standing has become somewhat confused." Local Beauty Supply, Inc. v. Lamaur Inc., 787 F.2d 1197, 1201 (7th Cir.1986). A two-pronged approach has slowly developed to examine whether a plaintiff is a proper party and thus should be afforded antitrust standing. First, a court should determine whether the plaintiff suffered "antitrust injury"; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury. This two-pronged approach was endorsed by the Supreme Court when it stated that "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under Sec. 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under Sec. 4 for other reasons." Cargill, 479 U.S. at 110 n. 5, 107 S.Ct. at 489 n. 5. In fact, we have implicitly recognized this approach for some time. See Austin, 903 F.2d at 1389 ("antitrust injury [i]s the touchstone for antitrust standing"); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710 (11th Cir.1984) (per curiam); Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1131 (5th Cir.1975); see also Bell v. Dow Chem. Co., 847 F.2d 1179, 1182 (5th Cir.1988) ("[p]roving antitrust injury is a necessary requirement for proving standing"); Alberta Gas Chems., Ltd. v. E.I. Du Pont de Nemours & Co., 826 F.2d 1235, 1240 (3rd Cir.1987); In re Indus. Gas Antitrust Litig., 681 F.2d 514, 516 (7th Cir.1982) ("From the class of injured persons suffering 'antitrust injury' only those parties who can most efficiently vindicate the purposes of antitrust laws have antitrust standing to maintain a private action under Sec. 4."), cert. denied, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983); see also Page, The Scope of Liability for Antitrust Violations, 37 Stan.L.Rev. 1445, 1457 (1985) (arguing that antitrust standing should be a method for courts to identify, from the class of plaintiffs suffering "antitrust injury," the most efficient plaintiff). We thus explain these two limitations generally, and then turn to our analysis of the present case.
 
 
 36
 In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court held that in order to maintain an antitrust action for treble damages a plaintiff must be able to show more than an injury linked to a violation of the antitrust laws; he must prove an "antitrust injury." Antitrust injury is defined as
 
 
 37
 injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."
 
 
 38
 Id. at 489, 97 S.Ct. at 697 (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)). This limitation is essential because it "requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation ... increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition." Austin, 903 F.2d at 1389-90 (quoting P. Areeda & H. Hovenkamp, Antitrust Law p 335.1, at 261 (Supp.1987)). This policy rationale is gleaned from the facts and opinion in Brunswick itself.
 
 
 39
 In Brunswick, the plaintiffs brought an action under section 7 of the Clayton Act[17] challenging the mergers of several of their competitors and seeking treble damages under section 4 of the Act.[18] The plaintiffs owned several bowling alleys and the defendant, Brunswick Corporation, was a large national manufacturer of bowling equipment and owner of several bowling alleys. Over a ten-year period, Brunswick had taken over many defaulting bowling alleys across the United States; these alleys would have gone out of business were it not for Brunswick's rescue. The plaintiffs claimed that their market share would have increased if the alleys with which they competed had been permitted to go out of business and sought lost profits in their challenge to these mergers. Although it assumed a violation of the antitrust laws, the Supreme Court rejected the Third Circuit's ruling that any loss "causally linked" to "the mere presence of the violator in the market" was compensable. Brunswick, 429 U.S. at 487, 97 S.Ct. at 696 (quoting NBO Indus. Treadway Cos. v. Brunswick Corp., 523 F.2d 262, 272-73 (3rd Cir.1975)). Instead, the Court denied recovery to the plaintiffs, noting that the antitrust laws were enacted for the "protection of competition not competitors," id. at 487-88, 97 S.Ct. at 697 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)), and concluding that the plaintiffs' injuries were due to an increase in competition and hence were not "the type that the statute was intended to forestall," id. at 487-88, 97 S.Ct. at 697 (quoting Wyandotte Transp. Co. v. United States, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967)). The Court later applied the antitrust injury doctrine to nonmerger cases. See, e.g., J. Truett Payne Co. v. Chrysler Motor Corp., 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). The lesson is that plaintiffs must plead and prove that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent.
 
 
 40
 The second prong used to determine whether a party is a proper plaintiff under section 4 involves an analysis of "other factors in addition to antitrust injury." Cargill, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6. These other factors are used to determine whether a particular plaintiff is an efficient enforcer of the antitrust laws. The Supreme Court enunciated these factors in Associated General. In Associated General two unions brought suit against an association of building and construction contractors alleging that the association coerced landowners and general contractors to enter into contracts with nonunion subcontractors. As a result, some general contractors, the union subcontractors, and the unions were allegedly harmed. The Court, assuming the defendants did coerce the third parties, conducted an analysis of the "plaintiff[s'] harm, the alleged wrongdoing by the defendants, and the relationship between them." Associated General, 459 U.S. at 535, 103 S.Ct. at 907. The Court acknowledged the impracticality inherent in the application of a "black-letter rule" to determine whether a plaintiff has standing to recover for an antitrust violation and opted for a balancing approach to evaluate the standing issue. Id. at 536, 103 S.Ct. at 908.[19]
 
 
 41
 The Court began its discussion by noting that the complaint alleged a causal connection between the plaintiffs' harm and an antitrust violation and that the defendants intended to cause that harm. This merely made the claim one "literally encompassed by the Clayton Act." Id. at 537, 103 S.Ct. at 908. The Court then conducted a more extensive inquiry. The first factor analyzed, under the heading the "nature of the plaintiff[s'] alleged injury," was whether the plaintiffs suffered antitrust injury. Id. The Court, after noting the "relevance of this central policy" to the antitrust standing issue, id., found that the plaintiffs had suffered no antitrust injury. Id. at 540, 103 S.Ct. at 909. The Court, however, continued to identify other factors that might be useful in determining whether a party is a proper plaintiff in a particular case;[20] these factors analyze whether the plaintiff would be an efficient enforcer of the antitrust laws.
 
 
 42
 The factors the Court identified share a concern for the "directness or indirectness of the asserted injury," id.; they also reflect consideration of the remoteness of the plaintiff's alleged harm. The Court began by analyzing the directness of the asserted injury in a causal sense. The unions' injuries were the result of the injuries inflicted upon their members. Thus, there were other parties, specifically the injured subcontractors and the coerced third parties, who had suffered a more direct injury than the plaintiffs in the case. Because of the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," the Court found that the justification for allowing a more remote party (i.e., one who suffered an indirect injury) privately to enforce the antitrust laws was diminished. Id. at 542, 103 S.Ct. at 910-11. Indeed, "[d]enying the [u]nion[s] a remedy ... [wa]s not likely to leave a significant antitrust violation undetected or unremedied." Id.
 
 
 43
 Another factor the Court discussed was that the plaintiffs' damages claims were highly speculative; this was due in part to the indirectness of the plaintiffs' injuries and the operation of other independent effects. This, of course, weighs against affording a plaintiff antitrust standing, as it does in common-law tort cases. The indirectness of the alleged injury also implicates the "strong interest ... in keeping the scope of complex antitrust trials within judicially manageable limits." Id. at 543, 103 S.Ct. at 911. Specifically, this refers to the importance of avoiding duplicative recoveries and the danger of complex apportionment of damages. For example, in Associated General, there was the alarming prospect that if the unions were awarded damages under section 4, the district court would have to "identify[ ] damages and apportion[ ] them among directly victimized contractors and subcontractors and indirectly affected employees and union entities." Id. at 545, 103 S.Ct. at 912. In other cases, there is the danger that the plaintiff's damages claim will include some damages more properly attributed to a less remotely injured party and that awarding the plaintiff these damages will lead to duplicative recovery, fostering inefficient enforcement of the antitrust laws. See, e.g., Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (denying recovery to indirect purchasers who paid an enhanced price because of a price-fixing conspiracy). In light of all these factors, the Court held that the unions were not proper plaintiffs to enforce the antitrust laws in this case and thus denied them standing.
 
 
 44
 These factors represent the issues considered under the second prong of the inquiry used to evaluate antitrust standing under section 4 of the Clayton Act. They are intended to assist a court's determination of whether a particular plaintiff will efficiently vindicate the goals of the antitrust laws. Other factors not spelled out by the Supreme Court also may be relevant to this issue. For example, a court should consider whether the plaintiff can enforce an antitrust judgment efficiently and effectively; if not, then the plaintiff may not be a proper plaintiff for antitrust purposes.
 
 
 45
 Dr. Todorov, in addition to his claims under section 4, also seeks injunctive relief under section 16 of the Clayton Act.[21] Section 16 differs in important ways from section 4. "For example, Sec. 4 requires a plaintiff to show actual injury, but Sec. 16 requires a showing only of 'threatened' loss or damage; similarly, Sec. 4 requires a showing of injury to 'business or property,' ... while Sec. 16 contains no such limitation." Cargill, 479 U.S. at 111, 107 S.Ct. at 489-90 (citation omitted). The showing required to establish standing under section 16 is also less demanding. The essential difference is that courts are less concerned about whether the plaintiff is an efficient enforcer of the antitrust laws when the remedy is equitable because the dangers of mismanaging the antitrust laws are less pervasive in this setting. Because section 16 provides for injunctive relief, not treble damages, the risk of duplicative recovery or the danger of complex apportionment that pervades the analysis of standing under section 4 is not relevant to the issue of standing under section 16. Id. at 111 n. 6, 107 S.Ct. at 490 n. 6.[22] Still, a plaintiff, in order to have standing under section 16, must allege threatened injury that would constitute antitrust injury if inflicted upon the plaintiff and the defendant's causal responsibility for such threatened injury. Id. at 113, 107 S.Ct. at 491. This is because, as the Supreme Court explained, "[i]t would be anomalous ... to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." Id. at 112, 107 S.Ct. at 490.
 
 
 46
 The analysis of antitrust injury for a section 16 claim is the same as for a section 4 claim. Thus, if a plaintiff has standing to bring an antitrust action under section 4, he will also have standing under section 16; however, a plaintiff may have standing to bring an action under section 16 but not have standing under section 4 because he is not an efficient plaintiff.
 
 
 47
 We now analyze Dr. Todorov's standing to bring his antitrust claims under sections 4 and 16 of the Clayton Act. Once again we must conduct an economic analysis of the market for administering CT scans of the head at DCH. Dr. Todorov alleges that the radiologists control this market and are reaping monopoly, or at least supercompetitive, profits.[23] Dr. Todorov applied for privileges in the radiology department so that he could reap the profits that the radiologists receive. The likelihood that he could do so, however, is remote--at least in the long run.
 
 
 48
 The radiologists do all their professional work in the radiology departments at DCH and its competitor, West Alabama General Hospital. Dr. Todorov spends most of his time at his office in Tuscaloosa;[24] he visits DCH when he has patients there. Given that the radiologists specialize in the administration of CT scans, whereas Dr. Todorov does not, they are likely to administer a scan more efficiently than he could. Another reason why the radiologists are likely to perform this task more efficiently is that they are located at the site of the CT scan machine--they need not travel to and from an office, as Dr. Todorov would, to do a scan.[25] Thus, it costs a radiologist less to administer and interpret a CT scan, and to prepare a report for the hospital's patient records, than it would cost Dr. Todorov. Because of this, even if Dr. Todorov were to receive the price the radiologists charge, he would not reap the supercompetitive profit they allegedly receive; Dr. Todorov's profits would be less than what the radiologists earn at that price. Still, it may profit Dr. Todorov to administer and interpret CT scans at the radiologists' inflated price.
 
 
 49
 As competition ensued, however, Dr. Todorov's profit for each CT scan procedure would shrink and would consistently be less than the radiologists' profit. Although Dr. Todorov could lower his operating costs, the radiologists, faced with his competition, would also fine tune their work; furthermore, if Dr. Todorov continued to specialize in neurology, he would continue to administer and interpret CT scans of the head less efficiently than the radiologists. At some point, he would no longer be able to compete with the radiologists; the radiologists would reduce the price of CT scans of the head until he could no longer participate in the market at a profit. At this point, Dr. Todorov would use the time he had been devoting to administering and interpreting CT scans of the head to treat patients in his neurology clinic, relying on the radiologists for the CT scan service.
 
 
 50
 This scenario reveals several things. First, if Dr. Todorov were granted privileges, he would reap the radiologists' supercompetitive price and thus some profit in the short run. Second, if competition ensued, consumers--the patients who purchase the CT scans of the head--would benefit because of the lower prices brought about by the competition. Finally, Dr. Todorov eventually would either be driven from the market or reach some agreement with the radiologists to fix prices. By conspiring in this way, Dr. Todorov would reduce the chance that he would be driven from the market by competition[26] and he could share the supercompetitive revenue, or some portion of it, with the radiologists; this, of course, would not benefit consumers.
 
 
 51
 This discussion makes it clear that Dr. Todorov's alleged injury is not the "type the antitrust laws were intended to prevent and that flows from that which make the defendants' acts unlawful." Brunswick, 429 U.S. at 489, 97 S.Ct. at 697. Dr. Todorov's alleged damages equal the profits he would have garnered had he been able to share a part of the radiologists' supercompetitive, or monopoly, profits.[27] This is not antitrust injury. The antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person.
 
 
 52
 This is not the first time a plaintiff has tried to use the antitrust laws as a means to gain benefits based on anticompetitive conduct. A good example is found in Local Beauty Supply, Inc. v. Lamaur Inc., 787 F.2d 1197 (7th Cir.1986). In that case, the plaintiff, a distributor, sued a manufacturer alleging that the manufacturer had terminated its distributorship because other distributors had complained about its practice of charging less than the prices fixed by the manufacturer and the other distributors. The plaintiff claimed as damages the profits it would have earned had it been able to continue to undercut the prices of the other distributors. The Seventh Circuit held that these damages did not constitute antitrust injury because "they represent[ed] [the plaintiff's] inability to continue to profit from the anticompetitive nature of the violation." Id. 787 F.2d at 1202-03. In other words, the plaintiff hoped that the anticompetitive price fixing would continue so that its profits would be steady. This put the plaintiff's interests at odds with the goal of increased competition. See also Jack Walters & Sons, Corp. v. Morton Bldg., Inc., 737 F.2d 698, 708-09 (7th Cir.), cert. denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); W. Goebel Porzellanfabrik v. Action Indus., 589 F.Supp. 763, 766 (S.D.N.Y 1984).
 
 
 53
 Dr. Todorov's claim is similar. If Dr. Todorov had been granted the privileges he requested, he would have earned profits as long as the radiologists maintained their inflated price; as competition ensued, he would have been driven from the market. Thus, Dr. Todorov's damages are premised on his ability to profit while consumers paid an artificially inflated price; he would have had no profits to lose once price settled at the competitive level. That Dr. Todorov is not the cause of these supercompetitive prices is not relevant to our inquiry; he seeks to benefit from them and urges us to let him use the antitrust laws to forward his cause. We, however, will not afford Dr. Todorov the use of the antitrust laws to recoup these alleged damages.
 
 
 54
 This analysis also convinces us that Dr. Todorov does not have standing to seek an injunction in this case. Our finding that Dr. Todorov has suffered no antitrust injury compels this result. Dr. Todorov's interests are not aligned with patients' interests; Dr. Todorov is interested in forestalling competition, and thus maintaining an inflated price, because at the competitive price his profit is zero. If we gave Dr. Todorov standing to seek an injunction, he would be acting only in his interest. Such an injunction would allow him to enter the market and share the radiologists' supercompetitive profits. The inability of a competitor to benefit from anticompetitive conduct is not the type of market distortion that the antitrust laws were promulgated to correct.
 
 
 55
 We recognize that Dr. Todorov's entrance into this market might have the effect of helping consumers. As we explain above, it is possible that Dr. Todorov's presence in the market would spur competition, resulting in lower prices for CT scan patients. It is also possible that even if Dr. Todorov were driven from this market, entry barriers, which previously had restricted the supply of radiologists, would have been removed, opening the way for free and unrestrained competition.
 
 
 56
 These arguments, however, have not been put forth by Dr. Todorov; his motive for seeking privileges to provide CT scan services is not so altruistic. Dr. Todorov is simply looking to increase his profits, like any competitor. As such, Dr. Todorov is a particularly poor representative of the patients; indeed, his interests in this case are so at odds with the patients' interests that it is unlikely that he would have standing under article III of the Constitution to present their claims. Dr. Todorov is thus no champion for the cause of consumers. If the radiologists or DCH are acting anticompetitively and are charging an inflated price, then the patients, their insurers, or the government, all of whom are interested in ensuring that consumers pay a competitive price, may bring an action to enjoin such practice.
 
 
 57
 We thus hold that Dr. Todorov has no standing under either section 4 or 16 of the Clayton Act to assert his section 1 or 2 claims.
 
 B.
 
 58
 Even if we were to afford Dr. Todorov standing to prosecute his antitrust claims, we would affirm the district court's grant of summary judgment. In the following discussion, we assume that Dr. Todorov has standing and we address his claims under sections 1 and 2 of the Sherman Act, respectively, and present alternative reasons for affirming the district court.
 
 1.
 
 59
 Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. Sec. 1. The terms "contract, combination ..., or conspiracy" are used interchangeably to describe the requisite agreement between two or more persons to restrain trade. Section 1 does not proscribe conduct that is wholly unilateral. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); Albrecht v. Herald Co., 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). "Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under Sec. 1 in the absence of agreement." Fisher v. City of Berkeley, 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986). Liability will only attach to agreements designed unreasonably to restrain trade in, or affecting, interstate commerce; thus, before analyzing the reasonableness of any alleged restraint on trade, courts must first ensure that an agreement to restrain trade exists.[28]
 
 
 60
 In the present case, Dr. Todorov alleges a conspiracy in restraint of trade between DCH and the radiologists. Initially, we note that such a conspiracy is actionable under section 1 of the Sherman Act. Bolt v. Halifax Hosp. Medical Center, 891 F.2d 810, 819 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). In Bolt, we held that a hospital and the members of its medical staff, all of whom were separate legal entities,[29] were capable of conspiring with one another. Id. Thus, we rejected the notion that the joint action of a hospital and the members of its medical staff denying a physician privileges at the hospital is a unilateral act and held that such concerted action is cognizable under section 1.
 
 
 61
 To prove that an agreement exists between two or more persons, a plaintiff must demonstrate "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). We recognize that only in rare cases--and the instant case is not one of them--can a plaintiff establish the existence of a section 1 conspiracy by showing an explicit agreement; most conspiracies are proved by inferences drawn from the behavior of the alleged conspirators. DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1515 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). Antitrust law, however, limits the range of permissible inferences in cases based on circumstantial evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In such cases, the plaintiff, to survive a motion for summary judgment, must present evidence that reasonably "tends to exclude the possibility" that the alleged conspirators acted independently. Monsanto, 465 U.S. at 764, 104 S.Ct. at 1471. This means that "conduct as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588, 106 S.Ct. at 1356. For example, the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy. Bolt, 891 F.2d at 827. Thus, when the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative evidence that the law has been violated.[30]
 
 
 62
 As noted supra, Dr. Todorov has no direct evidence that DCH and the radiologists conspired to lessen competition in the hospital's radiology department as alleged in count one of his complaint. To prove a conspiracy, therefore, Dr. Todorov must rely on circumstantial evidence. His circumstantial evidence, considered in the light most favorable to him, establishes the following. First, he was qualified to administer and interpret CT scans of the head. Second, the radiologists had an economic interest in limiting the number of physicians performing such services at DCH.[31] Third, Drs. Bright, Kahler, and Askew furthered this interest when they recommended that Dr. Todorov's request for privileges be denied. Fourth, DCH followed their recommendation and denied the request. These facts suggest that the hospital may have conspired with the physicians as Dr. Todorov alleges; they do not, however, exclude the possibility that the hospital acted unilaterally, and procompetitively, in denying him the privileges he requested.
 
 
 63
 As we have shown, DCH has an incentive to foster competition among the radiologists in its radiology department: competition might lower the total price of CT scans to consumers (by reducing the portion of that price attributable to the radiologist's fee), attract more outpatients to DCH for CT scans (patients who might otherwise go to West Alabama General), and increase DCH's revenues and profits. Absent competition among the radiologists, however, DCH cannot attract more outpatients and increase its revenue and profits unless it reduces its portion of the total price of CT scans by producing the CT scan films more efficiently.
 
 
 64
 DCH could have fostered competition among the radiologists--and thus its potential for further profits--by granting Dr. Todorov, and, eventually, other nonradiologists, privileges to practice in its radiology department, but it chose not to do so. At first blush, DCH's decision appears to be anticompetitive and against its own self-interest--and therefore supportive of Dr. Todorov's argument that the hospital conspired to help the radiologists maintain their supercompetitive profits. Dr. Todorov, however, does not explain why the hospital would want to act this way; he simply concludes that it did.
 
 
 65
 We have searched the record for a possible, and reasonable, explanation as to why DCH would deliberately act against its own economic interest, and find none. What we find, instead, is that DCH denied Dr. Todorov's application for privileges to foster competition and to serve its own economic interest.
 
 
 66
 The principal reason DCH's board of directors gave for rejecting Dr. Todorov's application for privileges was to preserve the efficient operation of the hospital's radiology department. The board thought that if it granted Dr. Todorov privileges it would invite a flood of similar applications from nonradiologists, and as more of these physicians performed their own radiological procedures, the radiology department would become unmanageable--experiencing scheduling delays, increased operation and upkeep costs, and an overall decrease in the quality of service. This, in turn, would impair the department's ability to turn a profit. DCH thus claims, in effect, that its board decided that the competitive benefits the hospital's radiology department would gain--from greater efficiency--by denying Dr. Todorov privileges outweighed the additional revenue the department might generate--from a greater volume of business--by granting Dr. Todorov privileges.
 
 
 67
 Dr. Todorov claims that this procompetitive reason for denying him privileges is a mere pretext. According to Dr. Todorov, the board was not seeking to maintain a competitive edge in the market for the provision of CT scans, but acted only to further the radiologists' economic interest in preserving their supercompetitive profits.
 
 
 68
 Dr. Todorov bears the burden of proving that DCH's board of directors was willing to act against the hospital's economic interest simply to further the goals of the radiologists. He has failed to meet this burden.[32] All that Dr. Todorov has established is that the radiologists want to preserve their supercompetitive profits and that, to preserve these profits, some of them recommended that his application for privileges be denied. He argues that this is enough to create a permissible inference of an antitrust conspiracy. We disagree. The record amply supports the procompetitive reasons DCH's board of directors offered for its action. By denying Dr. Todorov the privilege of practicing in the radiology department, the board preserved the efficiency of the department's operation and thus its ability to compete in the market place. In short, the board acted procompetitively in the hospital's economic interest and not as the radiologists' coconspirator.
 
 
 69
 To infer a conspiracy solely from the radiologists' anticompetitive conduct and the board's denial of privileges would be, in effect, to criminalize perfectly legitimate conduct.[33] Under state law, and the medical staff bylaws, DCH's board of directors is specifically empowered to make the final decision as to whether to grant or deny privileges to an applicant. The application process at DCH is designed to elicit recommendations from medical staff members who may be more qualified to evaluate the competency of applicants than the hospital's board members. The board considers these various recommendations and other relevant information and makes its decision. Dr. Todorov's complaint is simply that the board, in this case, acted consistently with the recommendations it received. The Supreme Court has faced this type of procedure before in antitrust cases involving different areas. In these cases, the Court has also refused to infer a conspiracy from this bare circumstantial evidence. For example, in Parker, the State of California, pursuant to existing law, was authorized to implement certain supply restrictions only after ten private producers petitioned it to do so. The Supreme Court held that the state was immune from antitrust liability, despite the participation of the private producers in the implementation process, because "[t]he state itself exercises its legislative authority in making the regulation." Parker, 317 U.S. at 352, 63 S.Ct. at 314. In other words, the Court found that under this process the state acted unilaterally when it implemented the supply restrictions, despite evidence that private producers made recommendations to the state to implement these same restrictions.
 
 
 70
 In Monsanto, the Supreme Court analyzed the decision of the Monsanto Company, a manufacturer, to terminate Spray-Rite Service Corporation (Spray-Rite), a distributor, after Monsanto had received complaints from other distributors about Spray-Rite's price-cutting practices. Spray-Rite argued that the manufacturer and the complaining distributors were acting to further an illegal conspiracy in restraint of trade. The Court, after noting the legality of a manufacturer's unilateral decision to terminate a distributor who slashes prices below those set in advance by the manufacturer, stated that
 
 
 71
 [p]ermitting an agreement to be inferred ... from the fact that termination came about "in response to" complaints[ ] could deter or penalize perfectly legitimate conduct .... To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. In sum, "[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would ... inhibit management's exercise of its independent business judgment ...."
 
 
 72
 Monsanto, 465 U.S. at 763-64, 104 S.Ct. at 1470-71 (citations omitted) (quoting Edward J. Sweeney & Sons v. Texaco, Inc., 637 F.2d 105, 111 n. 2 (3rd Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). The Supreme Court went on to find sufficient evidence, some of it direct evidence, beyond the mere existence of complaints and the termination to uphold the finding of an agreement to restrain trade.
 
 
 73
 In this case, however, there is no additional evidence that reasonably suggests that DCH's board of directors and the radiologists conspired to deny Dr. Todorov's application for privileges. Dr. Todorov's showing that the hospital board had before it recommendations from the medical staff and that the radiologists were pleased with DCH's ultimate decision is, standing alone, insufficient to infer an antitrust conspiracy.[34] We will not, without more evidence of an agreement, infer a conspiracy and condemn the application process in this case as violative of section 1 of the Sherman Act.
 
 
 74
 We conclude that Dr. Todorov has failed to demonstrate a genuine issue of material fact concerning the existence of a conspiracy. Because of this, we find that DCH was not engaged in a conspiracy when it denied his application for privileges; instead, DCH was unilaterally executing its authorized power. Because we find no conspiracy, Dr. Todorov's section 1 claim must fail. As stated above, DCH is not liable under section 1 for its unilateral act.
 
 
 75
 Furthermore, the radiologists are not liable under section 1, even if they conspired among themselves to have Dr. Todorov's application for privileges denied. A private party seeking to invoke the antitrust laws must show that the defendants caused the alleged injury. See Cargill, 479 U.S. at 104, 107 S.Ct. at 484; J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); Brunswick, 429 U.S. at 477, 97 S.Ct. at 690. Dr. Todorov cannot make this showing here: DCH unilaterally denied Dr. Todorov's application for privileges; the radiologists, regardless of their desires, were not causally responsible for this decision. As with other causes of action that are tortious in nature, see Associated General, 459 U.S. at 532-33, 103 S.Ct. at 905-06 (noting that common-law limitations on damages apply to the antitrust laws as well); DeLong Equip. Co., 840 F.2d at 848 (citing Myers v. American Dental Ass'n, 695 F.2d 716, 723 (3rd Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983) (an antitrust claim is "in essence a form of tort alleging business injury")); Solomon v. Houston Corrugated Box Co., 526 F.2d 389, 392 n. 4 (5th Cir.1976), failing to show causation is fatal to a section 1 claim. Thus, Dr. Todorov cannot maintain an action against the radiologists under section 1 of the Sherman Act. We therefore affirm the district court's grant of summary judgment as to the section 1 claims.
 
 2.
 
 76
 Dr. Todorov also alleges that the appellees violated section 2 of the Sherman Act. Section 2 provides, in pertinent part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. Sec. 2. Section 2 imposes liability on both concerted and unilateral acts. See, e.g., Copperweld, 467 U.S. at 767 n. 13, 104 S.Ct. at 2739 n. 13 ("Sec. 2 does reach both concerted and unilateral behavior"); United States v. American Tobacco Co., 221 U.S. 106, 181-84, 31 S.Ct. 632, 648-50, 55 L.Ed. 663 (1911). Thus, we analyze the conduct of DCH and the radiologists separately to determine whether Dr. Todorov has a valid section 2 claim for relief.[35] We hold that DCH is immune from the antitrust laws because it is a local governmental entity and, in denying Dr. Todorov's application for radiology privileges, was acting unilaterally pursuant to state authorization.
 
 
 77
 This immunity is rooted in Parker v. Brown, 317 U.S. at 341, 63 S.Ct. at 307. In Parker, the Supreme Court held that when a state agency "made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government," the agency is not subject to liability under the Sherman Act. Id. at 352, 63 S.Ct. at 314. Parker itself, however, does not directly apply here. DCH is simply not a state agency acting as sovereign. Indeed, DCH does not contend that it is a state agency; rather, DCH contends that it is a local governmental entity.
 
 
 78
 The Parker doctrine has, however, been extended to cover the actions of local governmental entities. In Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Supreme Court held that when a municipality engages in anticompetitive conduct pursuant to a "clearly expressed state policy," the conduct constitutes state action for the purposes of Parker. Id. at 40, 105 S.Ct. at 1717.[36] We thus examine DCH in order to determine whether it qualifies for immunity under Town of Hallie; we conclude that it does.
 
 
 79
 DCH was incorporated in 1982 pursuant to resolutions adopted by the governing bodies of Tuscaloosa County, the City of Tuscaloosa, and the City of Northport. DCH's certificate of incorporation adopts all the power and authority provided by the Health Care Authorities Act of 1982, 1982 Ala. Acts No. 42-418 (codified as amended at Ala.Code Secs. 22-21-310 to -344 (1990)), which includes, in pertinent part:
 
 
 80
 Sec. 22-21-318. Powers of Authority.
 
 
 81
 (a) In addition to all other powers granted elsewhere in this article, and subject to the express provisions of its certificate of incorporation, an authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof in corporate form:
 
 
 82
 ....
 
 
 83
 (12) To select and appoint medical and dental staff members and others licensed to practice the healing arts and to delineate and define the privileges granted each such individual;....
 
 
 84
 (31) To exercise all powers granted hereunder in such manner as it may determine to be consistent with the purposes of this article, notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States....
 
 
 85
 ....
 
 
 86
 (c) As a basis for the power granted in subdivision (31) of the preceding subsection (a), the legislature hereby:
 
 
 87
 (1) Recognizes and contemplates that the nature and scope of the powers conferred on authorities hereunder are such as may compel each authority, in the course of exercising its other powers or by virtue of such exercise of such powers, to engage in activities that may be characterized as "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States; and
 
 
 88
 (2) Determines, as an expression of the public policy of the state with respect to the displacement of competition in the field of health care, that each authority, when exercising its powers hereunder with respect to the operation and management of health care facilities, acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state.
 
 
 89
 It is apparent from this Act that the Alabama legislature made any hospital organized pursuant to the Act a local governmental entity, labeling such a hospital a "political subdivision of the state." DCH, as a hospital so organized, clearly qualifies as a local governmental entity. Thus, DCH will be immunized from antitrust liability if, pursuant to the dictate of Town of Hallie, it was acting as authorized by the state when it engaged in the allegedly anticompetitive behavior.[37]
 
 
 90
 In Town of Hallie, the Supreme Court found a sufficiently clear articulation of state authority, in the state's enabling legislation for local sewage systems, for the City of Eau Claire to displace competition. A group of unincorporated townships had alleged that the City violated section 2 of the Sherman Act by monopolizing sewage treatment in the area, and by providing sewage treatment only to areas that were willing to be annexed by the City and use its sewage collection services. The state legislation, however, specifically authorized cities to refuse to provide sewage service to unincorporated areas. The Court held that the City was immune from liability under the state action doctrine of Parker because the anticompetitive conduct, although not expressly authorized by state statute, was a foreseeable result of giving the City the power to refuse to serve unannexed areas.
 
 
 91
 In Bolt, this court analogized Town of Hallie to a hospital's peer review process. We held that "when Florida's legislature authorized peer review in licensed medical facilities, it could foresee that [the hospital] would rely on recommendations made by a physician's peers and refuse to deal with (i.e., boycott) that physician." Bolt, 891 F.2d at 825 (citation omitted). This analysis parallels the situation in the present case.
 
 
 92
 DCH's enabling act, shown above, specifically authorizes DCH to make decisions regarding the staffing of the hospital, including decisions concerning the granting of privileges. In this Act, the state legislature affirmatively expressed a state policy that a hospital organized under such Act be permitted to engage in anticompetitive conduct, as understood by the antitrust laws of the United States, in exercising its specific powers of authority. Thus, unlike Town of Hallie and Bolt, this case involves a statute that expressly authorizes anticompetitive conduct. DCH's decision to deny Dr. Todorov's application was certainly authorized by the state. Furthermore, as in Bolt, it is fair to say that Alabama's legislature could foresee that DCH, or hospitals like DCH, would rely upon the recommendations of its medical staff in processing applications for privileges to practice in DCH's medical departments. Thus, that DCH, in exercising its power over the granting of additional privileges, relied upon the recommendations of a physician's peers and refused to deal with that physician does not subject DCH to antitrust liability. DCH is immune from antitrust liability under Town of Hallie.
 
 
 93
 With respect to Dr. Todorov's section 2 claim against the radiologists, we note that the causation problems associated with his section 1 claim against the radiologists, as explained in part II.B.1., also pertain to his section 2 claim. See supra p. 1458. Since the decision to deny Dr. Todorov's application for privileges was a unilateral act by DCH, Dr. Todorov is unable to prove that the radiologists caused his injury. Thus, he cannot maintain an action against the radiologists under section 2 of the Sherman Act. We thus affirm the district court's grant of summary judgment as to the section 2 claims.
 
 C.
 
 94
 Count three of Dr. Todorov's complaint alleges that the appellees deprived him of his constitutional right to liberty or property without due process of law when they denied his application for additional privileges. Dr. Todorov seeks relief under 42 U.S.C. Sec. 1983. He claims that the failure of the credentials committee to make a recommendation for or against his application following the Hearing Panel's decision violated the medical staff bylaws. In addition, Dr. Todorov claims that the radiology department failed to have clear qualification criteria as required by the medical staff's bylaws. These defects in the application process, in addition to the involvement of some radiologists in that process, lead Dr. Todorov to conclude that DCH's decision to deny him privileges was arbitrary and capricious and, hence, violative of the due process clause of the fourteenth amendment. The district court held that Dr. Todorov did not have a constitutionally protected liberty or property interest in the request for additional privileges and, thus, granted summary judgment. In the alternative, the district court held that due process requirements, both substantive and procedural, had been met.
 
 
 95
 DCH, as a local governmental entity, is subject to 42 U.S.C. Sec. 1983. Monell v. Department of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Section 1983 provides individuals with a private cause of action when constitutional deprivations occur under color of state law. As discussed above, DCH's application process and decision was the exercise of a power specifically authorized by the state. Thus, DCH was acting under color of state law.
 
 
 96
 In order to maintain his due process claims, Dr. Todorov must demonstrate that the defendants deprived him of a constitutionally protected property or liberty interest. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569-71, 92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548 (1972).[38] We agree with the district court that Dr. Todorov was not deprived of such an interest.
 
 
 97
 To establish a property interest, the Supreme Court has stated that
 
 
 98
 a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it ....
 
 
 99
 Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
 
 
 100
 Id. at 577, 92 S.Ct. at 2709. This means that claims of entitlement, under the due process clause, must be supported by some state statute, legal rule, or a mutually explicit understanding. See Perry v. Sindermann, 408 U.S. 593, 601-02, 92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570 (1972). "To date, the Supreme Court has held that mutually explicit understandings can be proved through either the existence of an implied contract or through the existence of 'industrial common law.' " Shahawy v. Harrison, 778 F.2d 636, 642 (11th Cir.1985) (Shahawy I ). To support the claim of a property interest in the present case, Dr. Todorov must show an entitlement, under state law, to additional clinical privileges.
 
 
 101
 This court was presented with such a claim in Shahawy I. In that case, we stated that to establish a protected property interest in medical staff privileges, a physician must allege injury to a contract right or an inability to practice medicine without the requested privileges. Id. at 643. In Shahawy I, we held that a physician with staff privileges did not have a constitutionally protected property interest in his application for additional privileges.
 
 
 102
 Dr. Todorov argues that Shahawy I was wrongly decided and directs us to our precedent to support his argument. He has, however, misread our precedent. Most of the cases he cites concern the termination of staff privileges. See, e.g., Shahawy v. Harrison, 875 F.2d 1529 (11th Cir.1989) (Shahawy II ) (where the hospital in Shahawy I subsequently refused to renew the physician's staff privileges); Northeast Ga. Radiological Assocs. v. Tidwell, 670 F.2d 507 (5th Cir. Unit B 1982); Woodbury v. McKinnon, 447 F.2d 839 (5th Cir.1971). These decisions are predicated on the existence of a contract right which comes into being once a physician is granted privileges and do not support Dr. Todorov's position. Dr. Todorov does not claim any contractual right in additional privileges; he only alleges a contractual right in the standards DCH uses to grant privileges.[39] If, however, there is no protected interest in the privileges, due process requirements will not delineate the procedures used to grant or deny these privileges.[40]
 
 
 103
 The remaining cases the plaintiff cites involve factual settings where the denial of staff privileges seriously limited the ability of a physician to engage in private practice. See, e.g., Shaw v. Hospital Auth., 507 F.2d 625 (5th Cir.1975). This court has held, however, that if the denial of staff privileges does not seriously foreclose the ability of a physician to engage in private practice, then the physician does not satisfy his burden of presenting facts to show that a property interest existed. See Burkette v. Lutheran Gen. Hosp., 595 F.2d 255, 256 (5th Cir.1979); see also Daly v. Sprague, 675 F.2d 716, 727 (5th Cir.1982), cert. denied, 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 802 (1983). Dr. Todorov cannot contend that his ability to engage in private practice has been seriously impaired by the denial of radiology privileges: Dr. Todorov is a neurologist who wants radiology privileges to further his neurology practice; he has practiced, and continues to practice, neurology without such privileges.
 
 
 104
 Finally, Dr. Todorov's claim that he is losing prospective income because of the denial of radiology privileges does not create a property interest in these privileges. This court recently held that the expected economic value of staff privileges does not create a property interest in those staff privileges. See Faucher v. Rodziewicz, 891 F.2d 864, 869 (11th Cir.1990).
 
 
 105
 In order to demonstrate a liberty interest, Dr. Todorov must show that he was "stigmatized in connection with a denial of a right or status previously recognized under state law." Moore v. Otero, 557 F.2d 435, 437 (5th Cir.1977). Dr. Todorov's retention of previously granted staff privileges "absent any showing that he had an entitlement to the [radiology] privileges negates his claim that he was denied 'liberty.' " Shahawy I, 778 F.2d at 644 (quoting Daly, 675 F.2d at 728); see also Faucher, 891 F.2d at 870; Moore, 557 F.2d at 438 (the plaintiff's "retention of employment negates his claim that he was denied a 'liberty' " interest). Moreover, Dr. Todorov has presented no evidence that he has been stigmatized in any way.[41]
 
 
 106
 Since we find that Dr. Todorov did not have a property or liberty interest in the additional privileges, we agree with the district court that Dr. Todorov's substantive and procedural due process claims cannot be maintained.
 
 III.
 
 107
 To summarize, the district court properly granted the defendants summary judgment as to the plaintiff's antitrust and due process claims. Dr. Todorov's antitrust claims fail because he has no standing to prosecute them under section 4 or 16 of the Clayton Act; he has suffered no antitrust injury. Alternatively, Dr. Todorov's section 1 and 2 claims fail even if we assume that he has standing to bring them.
 
 
 108
 Dr. Todorov's section 1 claims fail because there is no genuine issue of material fact concerning the existence of a conspiracy; DCH unilaterally denied Dr. Todorov's application for privileges. Since section 1 does not reach a unilateral act, DCH is not liable to Dr. Todorov under section 1. Furthermore, since DCH unilaterally denied Dr. Todorov's application, the radiologists cannot have caused Dr. Todorov's injury, as required for a private party to maintain a cause of action under the antitrust laws. Thus, the radiologists are not liable to Dr. Todorov under section 1 of the Sherman Act.
 
 
 109
 Dr. Todorov's section 2 claims also fail. We hold that DCH is immune from antitrust liability because it is a local governmental entity and was acting pursuant to state authorization when it denied his application for privileges. Thus, under Town of Hallie, DCH is immune from section 2 liability in this case. Additionally, Dr. Todorov is, once again, unable to show that the radiologists caused his injury. Thus, he has no case under section 2 of the Sherman Act.
 
 
 110
 Finally, we hold that Dr. Todorov did not have a protected liberty or property interest in his request for additional privileges. Thus, he cannot make out a claim under the due process clause of the fourteenth amendment.
 
 
 111
 The district court's decision is, therefore,
 
 
 112
 AFFIRMED.
 
 ANDERSON, Circuit Judge, concurring specially:
 
 113
 I concur in all of Chief Judge Tjoflat's opinion for the court, except for Part II.A. relating to standing.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Dr. Todorov has his office at The Neurology Clinic, P.C., a corporation of which he is the sole shareholder. He brought this suit in behalf of himself and the corporation. Though the district court did not reach the issue, we conclude that the corporation has no standing to sue in this matter. It is Dr. Todorov, not his corporation, who is seeking privileges at DCH and, thus, the relief prayed for in this case. Accordingly, in this opinion, we treat Dr. Todorov as the only appellant and the party plaintiff below
 
 
 [2]
 CT stands for computerized tomograph; a CAT scan (computerized axial tomograph) is a subcategory of this general area
 
 
 [3]
 On occasion, the radiologist merely consults the referring physician's written prescription for the CT scan
 
 
 [4]
 Some patients have negative reactions to contrast, causing medical problems. To ensure that such problems are handled properly, the radiologist closely monitors the use of contrast during a scan
 
 
 [5]
 Sometimes additional information can be obtained by manipulating the data already received by the CT scan computer and generating a new film. This reduces the need to administer additional CT scans
 
 
 [6]
 DCH also is required by the Joint Commission on Accreditation of Hospitals (JCAH), as a condition of accreditation, to maintain adequate medical records on each patient. Joint Comm. on Accreditation of Hospitals, Accreditation Manual for Hospitals 79 (1984). The JCAH requires that reports of radiological interpretations be included in a patient's medical record and that radiological procedures be documented and authenticated in the patient's record within 24 hours of the completion of the procedure. Id. at 82, 155
 
 
 [7]
 The medical staff bylaws, which contain this provision, do not indicate to whom the board may "refer the matter for further review."
 
 
 [8]
 Count four of Dr. Todorov's complaint presented a pendent state law claim against all of the defendants. This count is no longer in the case. Count five, which did not allege a cause of action, sought injunctive relief to remedy the violations of law asserted in counts one through four
 
 
 [9]
 For the text of section 1 of the Sherman Act, 15 U.S.C. Sec. 1, see infra part II.B.1
 
 
 [10]
 These sections of the Clayton Act authorize private actions for violations of the antitrust laws. Section 4 authorizes a private action for treble damages and provides, in pertinent part: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. Sec. 15(a) (1988). Section 16 authorizes a private action for injunctive relief, and provides, in pertinent part: "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." Id. Sec. 26
 
 
 [11]
 For the text of section 2 of the Sherman Act, 15 U.S.C. Sec. 2, see infra part II.B.2
 
 
 [12]
 42 U.S.C. Sec. 1983 provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [13]
 As noted above, the district court held that the radiologists were acting as employees of DCH and thus shared its immunity. This holding does not comport with our holding in Bolt v. Halifax Hosp. Medical Center, 891 F.2d 810, 819 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990), which came down after the district court granted summary judgment. In Bolt, we held that members of a hospital's medical staff should be considered independent legal entities for antitrust purposes if they are not employed by the hospital and are acting as separate economic actors. Id. The physicians in Bolt were members of the defendant hospitals' medical staffs who practiced medicine in their individual capacities; we held that the joint action of the physicians and the hospitals--in denying Bolt privileges--was not a unilateral act and that such action subjected them to scrutiny under section 1 of the Sherman Act. The facts of Bolt are strikingly similar to those in the present case. Here, the physicians are separate economic actors; thus, their actions are legally distinct from the hospital's actions. Accordingly, the district court could not properly base its summary judgment on the ground that the radiologists and DCH were a single legal entity
 
 
 [14]
 The district court held that the radiologists were insulated from antitrust liability under the Noerr-Pennington doctrine. We have serious doubts about the application of that doctrine to this case. The Noerr-Pennington doctrine immunizes from antitrust liability anticompetitive activity that consists of petitioning a governmental agency to obtain favorable legislation. This doctrine is premised on the need to protect the first amendment right to petition the government from censure by the antitrust laws and the belief that the Sherman Act is concerned with economics and not with politics. See 1 P. Areeda & D. Turner, Antitrust Law p 204b, at 46 (1978). The present case does not clearly involve the type of lobbying activity or political discourse generally protected by the first amendment. Rather, it involves activity that is more economic than political in nature. Thus, we decline to rely on this doctrine to affirm the district court's grant of summary judgment for the radiologists
 
 
 [15]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [16]
 This struggle has been compared with "the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause.' " Associated General, 459 U.S. at 535-36, 103 S.Ct. at 907
 
 
 [17]
 Section 7 of the Clayton Act proscribes mergers whose effect on competition "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. Sec. 18 (1988)
 
 
 [18]
 The plaintiffs in Brunswick also sought "a divestiture order, an injunction against future acquisitions, and such 'other further and different relief' as might be appropriate under Sec. 16 of the [Clayton] Act." 429 U.S. at 481, 97 S.Ct. at 693
 
 
 [19]
 The Supreme Court specifically rejected the "target area" test that had previously been used in this circuit. Associated General, 459 U.S. at 536 n. 33, 103 S.Ct. at 907 n. 33 (rejecting test as described by Pan-Islamic Trade Corp., 632 F.2d at 546-47; Jeffrey, 518 F.2d at 1131). But see Amey, 758 F.2d at 1496 (continuing to use the "target area" test)
 
 
 [20]
 The Court's approach in Associated General has bred much confusion in the lower federal courts. See M. Fordadas, Private Enforcement of the Antitrust Laws (Practising Law Institute No. B4-6829 1988); see also Amey, 758 F.2d at 1495 n. 4 (presenting the various approaches of the circuit courts of appeals). In Associated General, the antitrust injury issue was dispositive of the case; that the Court went on to discuss other factors suggested that antitrust injury was not a separate threshold question, but was, instead, one of several factors to be balanced when determining antitrust standing. As stated earlier, however, Cargill has clarified that antitrust injury is a necessary component of antitrust standing. Thus, the discussion of factors beyond antitrust injury in Associated General is best viewed as dicta. This dicta was adopted by the Court in Cargill as the second part of antitrust standing analysis
 
 
 [21]
 For the text of section 16 of the Clayton Act, see supra note 10
 
 
 [22]
 As the Court explained, "one injunction is as effective as 100, and, concomitantly, ... 100 injunctions are no more effective than one." Cargill, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6 (quoting Standard Oil Co., 405 U.S. at 261, 92 S.Ct. at 891)
 
 
 [23]
 We recognize that all markets for physicians' services are somewhat restricted because of licensing requirements and that the prices charged in these markets are higher than they might be if these requirements did not exist. When we discuss supercompetitive profits we mean the profits earned in comparison to what would be earned if the market for providing CT scans operated without illegal restrictions to entry imposed on qualified physicians; competitive profits are those profits that would be earned when all qualified physicians competed freely
 
 
 [24]
 Dr. Todorov's practice is very successful. He testified that he works well over 40 hours a week in his neurology practice, sometimes up to 14 hours a day
 
 
 [25]
 This travel would create additional costs for Dr. Todorov beyond the obvious costs associated with the time required for travel. Each procedure performed on a CT scan machine at DCH must be scheduled in advance. Many times this schedule is unexpectedly disrupted; this occurs because of delays associated with performing a particular CT scan or emergencies that require the use of a CT scan machine. Thus, on occasion, Dr. Todorov would travel to the hospital to perform a scheduled CT scan and be forced to wait for the machine to become available. This waiting time would add to his cost of performing a CT scan. Furthermore, since Dr. Todorov would not be at his office, he would be unable to use this waiting period to perform other, profitable work
 
 
 [26]
 If Dr. Todorov entered into such an agreement, he would have to ensure that every other physician who was granted radiology privileges also joined in the agreement. Once one physician decided to cut prices and competition ensued, Dr. Todorov would be driven from the market
 
 
 [27]
 It is possible that Dr. Todorov would be a more efficient provider of CT scan services for his patients than the radiologists and that he would be able to make a profit if he charged them a competitive price for this service. This would mean that a portion of Dr. Todorov's damages equalled the competitive profits he lost because he was unable to provide CT scan services to his patients. Dr. Todorov, however, has not limited his damages claim to this small sliver of potential lost profits; nor does he present his argument in this way. Furthermore, it is doubtful that his proof of such limited damages could ever amount to more than mere speculation
 
 
 [28]
 In cases where the per se rule applies, such as horizontal price-fixing cases, the only inquiry is whether there was an agreement to restrain trade, since the unreasonableness of the restraint is presumed. See, e.g., Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927)
 
 
 [29]
 The defendants in Bolt were hospitals and members of their medical staffs. The medical staff members were not employees of the hospitals but were physicians who practiced medicine in their individual capacities; each was a "separate economic entity potentially in competition with other physicians." Bolt, 891 F.2d at 819
 
 
 [30]
 For example, we have recognized the theory of conscious parallelism. Conscious parallelism is uniform business conduct by competitors that permits a court to infer the existence of a conspiracy between these competitors. See, e.g., Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939). The idea behind this theory is that competitors' parallel business decisions are probative of the existence of a conspiracy between these competitors. The evidence used to support this theory is circumstantial. To ensure that we do not punish unilateral conduct, however, we require more than mere evidence of parallel conduct by competitors to support an inference of a conspiracy; an agreement is properly inferred from conscious parallelism only when "plus factors" exist. See id. at 222-23, 59 S.Ct. at 472-73. For example, it is well settled in this circuit that evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest. See Pan-Islamic Trade Corp., 632 F.2d at 559. Furthermore, these "plus factors" only create a rebuttable presumption of a conspiracy which the defendant may defeat with his own evidence; this further ensures that unilateral or procompetitive conduct is not punished or deterred. See Interstate Circuit, 306 U.S. at 225-26, 59 S.Ct. at 474. This theory is unavailable to Dr. Todorov because DCH and the radiologists are not competitors in any market and both DCH and the radiologists acted in favor of their own economic interests in this case
 
 
 [31]
 If the number of physicians permitted to perform these services--and the competition among them--increased, the fees they could obtain for these services would decrease (a straightforward application of the law of supply and demand)
 
 
 [32]
 Dr. Todorov presented evidence that DCH once offered the radiologists a contract for the exclusive rights to perform and interpret radiological procedures at DCH. This evidence is not helpful to his cause. First, it does not reveal DCH's interests at the time of the denial of his application for privileges. Clearly, such a contract between DCH and the radiologists would give DCH a reason to help the radiologists further their goals; the terms of the contract would presumably benefit DCH and make it rational for DCH to deny privileges to other qualified radiologists. We, however, address a situation devoid of any contractual obligations and benefits resulting from the exclusion of qualified radiologists
 Furthermore, the analysis is different in a case involving an exclusive contract between a hospital and the hospital's medical staff, because in that situation there is explicit evidence of an agreement between the defendants and there is, possibly, another relevant market (the market for employment by physicians). See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 29-31, 104 S.Ct. 1551, 1567-68, 80 L.Ed.2d 2 (1984); Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1446-48 (9th Cir.1988). In the present case, with no exclusive contract between DCH and the radiologists, we must analyze the facts more carefully to determine first whether any agreement exists; only if we find an agreement do we consider the effects on competition and consumers.
 
 
 [33]
 To engage in a conspiracy in violation of section 1 of the Sherman Act is to commit a felony. See 15 U.S.C. Sec. 1
 
 
 [34]
 Dr. Todorov, although conceding that the hospital's board of directors makes the final decision on applications for privileges, argues that the board merely "rubber stamps" the recommendation of the medical staff. As proof of this contention, he points to the deposition testimony of the hospital administrator, James H. Ford, that he did not recall any applicant for privileges who, after securing a favorable recommendation from the credentials or executive committees of the medical staff, had been turned down by the board. Dr. Todorov has, however, ignored that part of Mr. Ford's testimony where he states that "there has [sic] been a number of times that the board has reviewed privilege recommendations and have [sic] sent them back for reconsideration.... The board has not accepted every recommendation made by the credentials committee." Thus, the hospital's board does more than simply "rubber stamp" the recommendations of the medical staff. That the board is likely to follow the recommendations of the medical staff does not establish, or even reasonably suggest, the existence of a conspiracy. The plaintiff's argument eviscerates the agreement requirement of section 1
 
 
 [35]
 In addition to the section 2 monopolization claim, Dr. Todorov alleges in count two of his complaint that DCH and the radiologists conspired to monopolize the market "for CT scans of the head" and that they denied his application for privileges to further this conspiracy. To establish a conspiracy to monopolize, a plaintiff is required to prove: (1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy. See American Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1579 n. 8 (11th Cir.1985); see also L. Sullivan, Handbook of the Law of Antitrust 132-34 (1977). Thus, a section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing--the existence of an agreement to restrain trade. See R. Posner, Antitrust Law: An Economic Perspective 216 (1976) ("As for conspiracy to monopolize, any such conspiracy is also a conspiracy in restraint of trade, which violates section 1."). After this showing is made, then the plaintiff is required, under section 2, to show that the conspiracy was formed with the specific intent to obtain or maintain a monopoly. Here, however, as shown above in part II.B.1., Dr. Todorov has failed to demonstrate a genuine issue of material fact as to the existence of a conspiracy between DCH and the radiologists. Because of this failure, Dr. Todorov cannot maintain his section 2 conspiracy claim; it is unnecessary to conduct the specific intent analysis that is peculiar to a section 2 conspiracy claim
 
 
 [36]
 Immunity is also available to private parties under the progeny of Parker if they are actively supervised by the state. California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). When the defendant is a local governmental entity, however, there is no requirement that the defendant be actively supervised by the state in order to enjoy the protection of Parker. Town of Hallie, 471 U.S. at 47, 105 S.Ct. at 1720
 
 
 [37]
 It would be incorrect to argue that DCH, as a political subdivision of the state, is also an agent of the state and, thus, is protected directly by Parker. A political subdivision is not the same as an agency. For example, in title 4 of the Alabama Code, a political subdivision is defined, for purposes of that chapter, as "[a]ny municipality, city, town, or county." Ala.Code Sec. 4-6-2 (1981). None of these entities is an agent of the state, at least not for Parker purposes. Additionally, title 22, chapter 21 of the Alabama Code, defines "person" as including a political subdivision of the state and any state agency, indicating a distinction between the two entities. See Ala.Code Sec. 22-21-260(8) (1990). Thus, DCH must rely on Town of Hallie to be immunized from the antitrust laws
 
 
 [38]
 This requirement is applicable to both substantive and procedural due process claims. See Nolin v. Douglas County, 903 F.2d 1546, 1554 (11th Cir.1990); Thompson v. Bass, 616 F.2d 1259, 1264 (5th Cir.1980) (citing Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976); Megill v. Board of Regents, 541 F.2d 1073, 1081 (5th Cir.1976))
 
 
 [39]
 It might be argued that Dr. Todorov has a property interest in the standards themselves. This would mean that the decision not to use the established standards could occur only if due process was afforded. We first note that this is not the claim in this case. Further, it appears this argument must fail
 The Supreme Court has, in effect, addressed Dr. Todorov's argument in a line of cases addressing state prisoners' claims that they have a protected "liberty" interest by virtue of procedural provisions in the state parole release statute and regulations. In Olim v. Wakinekona, 461 U.S. 238, 250-51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983), the Court stated that
 [p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.... The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.
 (Citations and footnote omitted.)
 In Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), the Court held that
 [t]he creation of procedural guidelines to channel the decisionmaking of prison officials is ... a salutary development.... The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the State chose to require.
 Other courts have held that only when the procedural requirements are intended to impose significant substantive restrictions on the decisionmakers' discretion would the individual acquire a protected interest. See Skeets v. Johnson, 816 F.2d 1213 (8th Cir.1987) (en banc); Weinstein v. University of Illinois, 811 F.2d 1091, 1097-98 & n. 5 (7th Cir.1987) ("procedural protections are not themselves property"); Hogue v. Clinton, 791 F.2d 1318, 1324 (8th Cir.1986); Goodisman v. Lytle, 724 F.2d 818, 820-21 (9th Cir.1984). Notable is the observation of the Seventh Circuit that
 [c]onstitutionalizing every state procedural right would stand any due process analysis on its head. Instead of identifying the substantive interest at stake and then ascertaining what process is due to the individual before he can be deprived of that interest, the process is viewed as a substantive end in itself. The purpose of a procedural safeguard, however, is the protection of a substantive interest to which the individual has a legitimate claim of entitlement.
 Shango v. Jurich, 681 F.2d 1091, 1101 (7th Cir.1982).
 In the present case, Dr. Todorov's claim is equivalent to the prisoners' claims in Olim and Hewitt. The procedures at DCH are designed to put some order into the application process to ensure that the hospital's board receives thoughtful and fair recommendations from the medical staff. This, in turn, helps the hospital's board make proper decisions. This does not, however, convert the additional privileges Dr. Todorov seeks into protected property interests.
 
 
 [40]
 For example, in Leis v. Flynt, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (per curiam), the Supreme Court held that lawyers licensed to practice law in one state do not have a liberty or property interest in appearing pro hac vice in another state and, thus, declined to inquire as to whether a state trial judge had made an arbitrary decision in refusing to accept the attorneys' pro hac vice applications
 
 
 [41]
 The denial of Dr. Todorov's application for privileges is not, in and of itself, a stigma. Indeed, Dr. Todorov alleges that he was found by the medical staff's credentials committee to be competent but that he was denied staff privileges for some other reason. We cannot presume stigmatization; Dr. Todorov has failed to present evidence showing that he was stigmatized