[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10231

_____

INTERNATIONAL CONSTRUCTION PRODUCTS, LLC,

Plaintiff-Appellant,

*versus*

RING POWER CORPORATION,
ZIEGLER INC.,
THOMPSON TRACTOR COMPANY, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:20-cv-00226-TKW-MJF

_____

Before BRANCH and GRANT, Circuit Judges, and SCHLESINGER,* District Judge.

PER CURIAM:

This antitrust case involves dealers of heavy construction equipment and their relationship with industry auction platforms. Plaintiff-Appellant International Construction Products, LLC ("ICP") sued Defendant-Appellees Ring Power Corporation ("Ring Power"), Thompson Tractor Company ("Thompson"), and Ziegler Inc. ("Ziegler") (collectively "Defendants") for alleged violations of § 1 of the Sherman Act and for tortious interference with contract. In essence, ICP alleged that Defendants conspired to thwart ICP's relationship with IronPlanet, a heavy construction equipment auction site, by conspiring to boycott IronPlanet if it did not cut ties with ICP. The district court granted Defendants summary judgment on each of ICP's claims. After review, and with the benefit of oral argument, we affirm.

## I.    Factual Background

ICP was a distributor of new (as opposed to used) heavy construction equipment that sold its products online directly to consumers. This business model was unusual in the heavy

_____

* Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

construction equipment marketplace because such equipment is typically sold through an intermediary dealer network.

Defendants are dealers of heavy construction equipment manufactured by Caterpillar, Inc. They often sell their used equipment through online auction websites, such as IronPlanet, or through auction companies, such as Cat Auction Services ("CAS")[1] and Ritchie Bros. Auctioneers ("Ritchie Bros").[2] Importantly, Defendants had ownership interests—some overlapping—in the auction market: Ring Power was a minority shareholder of IronPlanet; Ziegler was a minority shareholder of CAS; and Ziegler's president and CEO, Bill Hoeft, was a founding member and chairman of the board of directors of CAS.

The industry auction companies began to consolidate. In January 2014, IronPlanet and CAS began merger negotiations that were consummated in 2015. Then, the newly-merged entity merged again—this time with Ritchie Bros, consolidating the three

---

[1] Caterpillar held a 29.8% stake in CAS.

[2] Typically, buyers of heavy construction equipment rely upon dealer networks to connect them with distributors. Distributors, such as ICP, considered the development of a traditional dealer network a steep barrier to entry into the heavy equipment market, requiring them to connect with middlemen who would in turn connect them to buyers. Buyers also had the option of buying equipment through online auction sites, like IronPlanet, that permit them to place bids on pieces of equipment at online auctions, sealed-bid auctions (in which buyers simultaneously submit sealed bids to the seller), and on-site auctions. *See How to buy*, IronPlanet, https://www.ironplanet.com/how-to-buy?kwtag=footer.

companies into one.  Hoeft, a member of the CAS merger team, was in regular contact with IronPlanet during these mergers.

While the IronPlanet-CAS merger negotiations were ongoing, in March 2014, ICP struck a deal with IronPlanet to have IronPlanet sell ICP's new heavy construction equipment on its website through a dedicated IronPlanet-ICP online storefront.  ICP and IronPlanet announced the deal at a trade expo and made waves, as the new venture represented a shift in the longstanding business model of the heavy construction equipment industry.[3] The following month, IronPlanet abruptly terminated its relationship with ICP.  According to deposition testimony of IronPlanet employees, the deal with ICP consumed extensive technological resources, distracted from the "top priority" (the IronPlanet-CAS merger), and was not as lucrative as originally anticipated.[4]

The Defendants for their part made their own concerns about the ICP partnership known to IronPlanet.  Two weeks after the announcement of the IronPlanet-ICP deal, CAS CEO Gary

---

[3] The record demonstrates that various stakeholders were concerned about the IronPlanet-ICP deal due to the possibility of IronPlanet shifting from an auction site that was manufacturer-neutral to one that promoted one manufacturer over another.  Not only was Caterpillar (as the manufacturer) concerned about the IronPlanet-ICP deal, but the dealers (as exclusive Caterpillar dealers) were also concerned with the possibility of having their used equipment listed next to new equipment and potentially selling for less.

[4] In fact, only a single sale was made through the new ICP storefront.

Trettel emailed Hoeft (Ziegler Chairman and CAS board member): "[CAS] is greatly concerned over this development [*i.e.*, the IronPlanet-ICP deal] and we will need to have discussions on how to proceed with the [merger] negotiations. [Caterpillar] has indicated this would kill the" IronPlanet-CAS merger.

Hoeft then sent an email to IronPlanet CEO Greg Owens on March 18, 2014. Hoeft's email, sent in response to IronPlanet's most recent merger offer, was signed with his name and one of his titles: "Chairman, President & CEO, Ziegler Inc." The email stated, in relevant part:

> We and Caterpillar, noted the recent article in Equipment World, which highlighted Iron Planet's new relationship with [ICP]. We would like to better understand that relationship, as we are concerned that Caterpillar and the CAT dealers would have significant concerns about any arrangement where Iron Planet is providing auction services for new equipment for a Caterpillar competitor.[5]

---

[5] An investment banker for CAS drafted a proposed email to be sent by Hoeft to IronPlanet that stated, in relevant part:

> We and Caterpillar noted . . . Iron Planet's new relationship with [ICP]. Without more full understanding, I have a strong suspicion that such a relationship would kill any hope of a transaction between Iron Planet and [CAS] from Caterpillar's perspective.

This proposed email was not sent.

In April 2014, executives from Ring Power and Thompson discussed the IronPlanet-ICP deal with each other. On April 1, following a Ring Power board meeting, Ring Power's Senior VP Richard Fowler commented in an email to other Ring Power executives that Caterpillar was "not happy" with the prospect of the IronPlanet-ICP deal. Over a period of two days that month, Fowler also had several phone calls with two Thompson officials (Billy Seals and Richard Lindley),[6] IronPlanet CEO Owens, and Caterpillar's merger liaison.

On April 3, 2014, IronPlanet scrubbed ICP's products from its website—supposedly without informing ICP beforehand. On April 4, IronPlanet President Jeff Jeter called ICP founder and chairman Tim Frank to inform him the deal was off because of "concerns over" the relationship. Jeter told Frank that Caterpillar and at least one other manufacturer were "putting pressure" on IronPlanet to terminate the ICP deal and told him that they would "stop doing business with [IronPlanet] on the equipment side" if the deal was not terminated.[7] Jeter wrote in an email to Owens

---

[6] Lindley testified that these calls with Fowler did not concern IronPlanet or ICP, relating instead to a piece of used equipment.

[7] Specifically, Jeter told Frank that Caterpillar and at least one other manufacturer were "putting pressure" on IronPlanet to terminate the ICP deal and told him that they would "stop doing business with [IronPlanet] on the equipment side" if the deal was not terminated. The district court, in its summary judgment order, ruled that, to the extent ICP offered this evidence to prove the truth of the matter asserted (*i.e.*, that IronPlanet terminated its relationship with ICP because of pressure it received from Caterpillar and

that same day summarizing his conversation with Frank, stating that Frank "underst[ood their] pressure and said he suspect[ed it would] be hard to brush off if they are serious."[8]

Thompson's Lindley, while negotiating a consignment of a six-machine package between Thompson and IronPlanet, heard about the ICP deal and had asked IronPlanet's Bob Winnette "what does this mean?" On April 4, Winnette informed Lindley that ICP products had been removed from the IronPlanet website. Three days later, Winnette sent an internal email stating that they "need[ed] a statement from Owens, Jeter, or [another IronPlanet VP] with [IronPlanet's] status and where we are headed if anywhere with ICP." He warned that, "[u]ntil [they] have a statement . . . Thompson is in the holding pattern with us." Jeter, in response, stated, "Our deal with ICP has been terminated and removed from the IronPlanet website." Jeter's email was then

---

other entities), it was hearsay. The district court also ruled that it did not qualify as non-hearsay under Federal Rule of Evidence 801(d)(2)(E) as a co-conspirator statement because IronPlanet was not alleged to be a co-conspirator. The district court further ruled that the statements were not admissible under the exception for unavailable witnesses under Rule 804(b)(3)(A). During his deposition, Jeter testified that he did not recall the substance of his conversation with Frank but did not testify that he forgot having the conversation at all; thus, he was not unavailable under Rule 804(a)(3). Regardless of its ruling, the district court chose to consider Jeter's statements as part of the summary judgment record and concluded that they were not direct evidence of a conspiracy and did not tie any specific Defendant to the supposed "pressure" on IronPlanet.

[8] Jeter later testified that "they" referred to manufacturers and dealers.

forwarded to Thompson officials by Frank Langham of IronPlanet. Lindley requested "a [W]ord document on IronPlanet letterhead with [that] statement" with Jeter's "name and title at the end." IronPlanet complied.

Several days later, on April 14, 2014, after exchanging emails regarding the termination, Jeter and Frank spoke on the phone. Jeter told Frank that "the pressure they were under was very strong," and when Frank asked from whom the pressure was coming, Jeter responded "you know who our investors are." In June 2014, Thompson VP Kenny Bishop wrote in an email to a Caterpillar official that IronPlanet's deal with ICP caused an "uproar" from Caterpillar dealers, causing IronPlanet to remove ICP from its website.

On January 29, 2015, ICP sued Caterpillar, CAS, and various other manufacturers in federal court in Delaware seeking compensatory damages and injunctive relief under federal antitrust laws, as well as compensatory damages, punitive damages, and injunctive relief under state law. The Delaware court granted ICP leave to amend to add the three dealer Defendants in this appeal. The court initially dismissed the claims against the dealers for lack of personal jurisdiction, but then reconsidered and transferred the claims to the Northern District of Florida. The claims against Caterpillar remained in Delaware.

Following transfer, the Florida district court granted ICP leave to file an amended complaint focusing on the claims against the dealer Defendants. The amended complaint advances four

causes of action: two claims under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 (Counts 1 and 2), and two claims for tortious interference under state law (Counts 3 and 4).[9] ICP alleged that Defendants, in conjunction with Caterpillar and another manufacturer, illegally conspired to cause IronPlanet to terminate its contract with ICP by boycotting and pressuring IronPlanet. Defendants each denied ICP's allegations and asserted various affirmative defenses, including that their conduct was lawful, justified, and pro-competitive.

The district court established a two-phase discovery schedule, limiting Phase 1 to fact discovery on the issue of whether a conspiracy existed to boycott IronPlanet. At the close of Phase 1, the court would entertain summary judgment motions before moving on to Phase 2, which would focus on expert discovery and the "issues of market definition, antitrust injury, and damages." Phase 1 of discovery ended in July 2021, at which time Defendants each filed motions for summary judgment.

The district court granted Defendants' motions for summary judgment on all counts. First, as to the Sherman Act § 1 antitrust claims, the district court found that "no reasonable jury could find that Defendants individually threatened to boycott IronPlanet if it did not terminate its relationship with [ICP]. Accordingly, there is no parallel conduct from which the jury could

---

[9] The complaint alleged that the relevant state law was that of Illinois or, in the alternative, Florida.

possibly infer the existence of a conspiracy." The district court concluded that "the summary judgment evidence d[id] not tend to exclude the possibility that Defendants acted independently and [the evidence was] as consistent with permissible competition as with illegal conspiracy."

Second, as to ICP's state law claims, the district court, applying Florida law,[10] held that "there [was] no evidence from which a jury could find that [Defendants] intentionally and unjustifiably interfered with the business relationship between IronPlanet and [ICP] or induced IronPlanet to breach its agreement with [ICP.]" The district court ultimately concluded, as to both claims, that while

> a reasonable jury could find that IronPlanet was "pressured" into terminating its relationship with [ICP], there is simply no evidence (direct or circumstantial) from which a jury could find that the dealer [D]efendants named in this case were responsible for exerting that pressure, much less that they unlawfully entered into an agreement to do so.

Additionally, the district court determined that, as to Thompson and Ziegler specifically, even if they had threatened to boycott IronPlanet because of the ICP deal, those Defendants were justified (or "privileged") under the Restatement (Second) of Torts § 766

---

[10] The district court recognized that, while the parties disagreed as to which state law applied (North Carolina, Illinois, or Florida), they agreed that there were no material differences in the applicable law of those states.

cmt. *l* and Florida law in refusing to deal with IronPlanet out of concern for their own respective business interests. The district court entered final judgment for Defendants, and ICP timely appealed.

## II.    Discussion

### A.  Sherman Act claims

Under § 1 of the Sherman Act, "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . among the several States, or with foreign nations or commerce among the several States, or with foreign nations" is illegal. 15 U.S.C. § 1. Notably, "the Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (*en banc*) (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982)). Section 1, therefore, "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade." *Id.*

The "first inquiry" of a Sherman Act claim is whether defendants made an "agreement that restrains trade." *Tidmore Oil Co. v. BP Oil Co./Gulf Prod. Div.*, 932 F.2d 1384, 1388 (11th Cir. 1991). Importantly, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal'"; only "collusion," rather than independent action, is proscribed. *Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004)

(quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  An illegal conspiracy under § 1 can be demonstrated in two ways: direct *or* circumstantial evidence.

A plaintiff can present "direct . . . evidence that reasonably tends to prove that the parties 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Dinnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1579 (11th Cir. 1988) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  That being said, "it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement."  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573–74 (11th Cir. 1991).  "Direct evidence is evidence which, if believed, resolves a matter in issue."  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (quoting parenthetically 1 John W. Strong et al., McCormick on Evidence § 185, at 777 (4th ed. 1992)).  It is evidence that "is based on personal knowledge or observation and that, if true, proves a fact *without inference or presumption.*"  *Evidence*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

"[M]ost conspiracies are proved by inferences drawn from the behavior of the alleged conspirators."  *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991).  To survive summary judgment on the basis of circumstantial evidence, a "plaintiff must present 'evidence that tends to exclude the possibility that the [defendants] were acting independently.'"  *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Inc.*, 989 F.3d at 1233 (quoting

*Monsanto*, 465 U.S. at 761). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Harcros*, 158 F.3d at 570 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The plaintiff, "in other words, must show that the inference of conspiracy is reasonable in light of the competing inference[ ] of independent action." *Id.* (quoting *Matsushita*, 475 U.S. at 588 (alterations in original)).[11] The evidence "need not be such that *only* an inference of conspiracy may be derived from it," but the evidence must "tend to exclude the inference of independent action." *Am. Contractors*, 989 F.3d at 1234 (quoting *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1509 (11th Cir. 1989)). "Mere equipoise of the evidence does not establish an agreement." *Id.* at 1233.

While "parallel business behavior" or "conscious parallelism" can be circumstantial evidence of a conspiracy, the fact that defendants engaged in parallel conduct does not, on its own, establish a conspiracy for purposes of § 1. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 n.7 (2007). Rather, the plaintiff must demonstrate that "each defendant engaging in the parallel action acted contrary to its economic self-interest, or [show] other 'plus factors' tending

---

[11] We have stated that "courts must be mindful that," while "'on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion[,] . . . antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.'" *Harcros*, 158 F.3d at 569–70 (quoting *Matsushita*, 475 U.S. at 586 (alteration adopted).

14                    Opinion of the Court                    22-10231

to establish that the defendants were . . . in a collusive agreement to . . . restrain trade." *Harcros*, 158 F.3d at 570–71 (internal quotation omitted). Neither our Court nor the Supreme Court has established a definitive list of "plus factors"; instead, any evidence that "tends to exclude the possibility of independent action" could operate as a "plus factor" sufficient to enhance circumstantial evidence beyond "the realm of equipoise." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (quoting *Harcros*, 158 F.3d at 571 n.35). "[A]n agreement is properly inferred from conscious parallelism only when 'plus factors' exist." *Todorov*, 921 F.2d at 1456 n.30.[12]

### 1. Direct Evidence

In its opening brief, while not clearly articulated, ICP appears to argue that there is direct evidence of a conspiracy among Defendants. But contrary to ICP's arguments on appeal, the summary judgment record does not contain *any* direct evidence of an agreement between Defendants to boycott IronPlanet. In other words, there is no evidence that shows that Defendants explicitly agreed to boycott IronPlanet so that IronPlanet would terminate its relationship with ICP. We examine each piece of

---

[12] While we have not set forth an exhaustive list of plus factors in our prior case law, we have recognized that "a showing that the defendants' behavior would not be reasonable or explicable (*i.e.*, not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade," could constitute a plus factor. *Harcros*, 158 F.3d at 572.

evidence that ICP contends constitutes direct evidence and how it falls short.

First, ICP points to internal emails among Caterpillar executives discussing the IronPlanet-ICP relationship, including an email in which the Caterpillar official recounts that IronPlanet's Owens, during merger negotiations, said "if we [CAS and IronPlanet] can come to some for[m] of agreement, then the ICP initiative would go away." As an initial matter, neither Caterpillar nor IronPlanet are not defendants in this lawsuit. Accordingly, an internal corporate discussion with one non-party about another non-party is not in any way direct evidence of a conspiracy among the Defendants.

Second, ICP points to IronPlanet President Jeter's April 4 call with ICP founder and chairman Tim Frank to inform him the deal was off because of "concerns over" the relationship.[13] During that call, Jeter told Frank that Caterpillar and at least one other

---

[13] ICP argues that the district court erred in ruling that comments made by IronPlanet's Jeter to ICP's Frank during the April 4, 2014, phone call were inadmissible hearsay. "We review a district court's evidentiary rulings for abuse of discretion." *Great Lakes Ins. SE v. Wave Cruiser LLC*, 36 F.4th 1346, 1353 (11th Cir. 2022). "[E]ven a clearly erroneous evidentiary ruling will be affirmed if harmless." *Id.* (quotation omitted). An error is harmless unless "it affects the substantial rights of the parties." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (quotation omitted). Even assuming the district court incorrectly determined that the statement was admissible, the error was harmless because the district court considered the statement as supposed direct evidence of a conspiracy; therefore, ICP's substantial rights were not affected.

manufacturer were "putting pressure" on IronPlanet to terminate the ICP deal and told him that manufacturers and dealers would "stop doing business with [IronPlanet] on the equipment side" if the deal was not terminated. Direct evidence, by definition, does not require inferences to prove what it is offered to prove. This phone call is not direct evidence of a conspiracy among the Defendants because it requires several inferences: just because Frank understood that *some* dealers were putting pressure on IronPlanet does not mean (a) the dealers were the Defendants in this case or (b) the dealers agreed to put this pressure on IronPlanet as part of an illegal concerted effort. The telephone conversation cannot be direct evidence of an agreement on the part of Defendants due to the necessary inferences its consideration requires.

Third, ICP contends that Jeter's email to Owens on April 4 summarizing his conversation with Frank, in which he stated that Frank "underst[ood IronPlanet's] pressure and said he suspect[ed it would] be hard to brush off if they are serious," constitutes direct evidence. This email is not direct evidence of a conspiracy because, despite the fact that Jeter testified that those entities referenced in his email were manufacturers and dealers, the email does not indicate which specific entities were exerting pressure on IronPlanet, or whether those entities were doing so by virtue of an anticompetitive agreement. To conclude that the email and preceding conversation concerned the Defendants requires the drawing of multiple inferences.

Fourth, ICP points to Frank's testimony that when he asked Jeter "who besides Caterpillar was putting pressure on" IronPlanet, Jeter replied, "you know who our investors are." ICP argues that this is direct evidence of a conspiracy, given that Ring Power was a minority shareholder of IronPlanet. However, ICP gives away the game by arguing that there are "reasonable inferences [to be] drawn from Jeter's admission[.]" Direct evidence of a conspiracy does not require any inferences to be drawn and a mere reference to "investors" does not constitute proof of any unlawful conduct by Ring Power, much less a conspiracy between Ring Power and any other Defendant.

Fifth, ICP relies on a June 2014 email from Thompson VP Kenny Bishop to a Caterpillar official referring to "uproar from Cat dealers" prompting termination of the deal with ICP. But, by its own words, ICP necessarily concedes that this email is not direct evidence of a conspiracy when admitting that the desired conclusion is permitted only by an inference from consideration of the evidence.

Sixth, ICP points to an email from CAS CEO Gary Trettel to Ziegler's Hoeft stating that "[CAS] is greatly concerned over this development [*i.e.*, the IronPlanet-ICP deal] and we will need to have discussions on how to proceed with the [merger] negotiations. [Caterpillar] has indicated this would kill the" IronPlanet-CAS merger. This email is not direct evidence of a conspiracy because, on its face, it contains no mention of any agreement between

Defendants to boycott IronPlanet but rather speaks to CAS's opinion of the IronPlanet-ICP deal.

Seventh, ICP points to an email sent by Hoeft to IronPlanet's Owens stating, "We would like to better understand that relationship [with ICP], as we are concerned that Caterpillar and the CAT dealers would have significant concerns about any arrangement where IronPlanet is providing auction services for new equipment for a Caterpillar competitor." In ICP's view, the email "reflects Ziegler's coordination with others[,] speak[ing] on behalf of Caterpillar and a group of 'dealers.'" ICP contends that these emails "directly establish that Ziegler executives used the Cat Auction merger negotiations to pressure IronPlanet into severing its relationship with ICP." ICP is incorrect. The parties make much of the question as to what "hat" Hoeft was wearing when he sent this email—in other words, was he acting on behalf of Ziegler or the CAS merger team?[14] But even if we were to accept ICP's

---

[14] ICP raises as an enumeration of error the district court's apparent decision not to consider any events related to the CAS-IronPlanet merger because the Delaware district court previously ruled that the merger did not restrain trade. Accordingly, the district court did not permit ICP to rely upon the merger agreement to establish concerted action. However, the district court explicitly addressed the merger negotiations, including the email from Hoeft to Owens during negotiations expressing concern about the ICP-IronPlanet relationship. The district court also considered the context of the merger when analyzing the speed at which IronPlanet switched from building up the website featuring ICP's products to taking it down. The district court directly engaged with evidence from the merger negotiations and found it not to be probative evidence tending to show Defendants acted in concert in boycotting IronPlanet. To the extent that ICP argues that the district court was wrong in

22-10231              Opinion of the Court              19

argument that Hoeft sent the email in his capacity as a Ziegler representative rather than as a CAS representative, it is still insufficient direct evidence that Ziegler entered a conspiracy with the other Defendants to boycott IronPlanet. On its face, Hoeft's email simply asks for information about IronPlanet's relationship with ICP. To reach the conclusion that Ziegler entered into a conspiracy with the other Defendants, we would have to make several inferences—*e.g.*, that Hoeft was, in fact, acting on behalf of Ziegler rather than CAS, that Hoeft inquired after the IronPlanet-ICP deal at the behest of at least one other Defendant, and that an inquiry into the deal was intended to be and was received as a veiled threat to boycott IronPlanet—thus disqualifying this evidence as direct evidence of a conspiracy.

Eighth, ICP points to the emails between Thompson officials and IronPlanet in which Thompson sought confirmation that the deal with ICP had been terminated and the ICP products were removed from the IronPlanet website. These communications consisted of the following: IronPlanet's Winnette informed Lindley that ICP products had been removed from the IronPlanet website. Three days later, Winnette sent an internal email stating that they "need[ed] a statement from Owens, Jeter, or [another IronPlanet VP] with [IronPlanet's] status and where we

---

concluding that this information was not probative of concerted action, we agree with the district court. Communications between non-parties are not probative of the Defendants actions in this case (even granting ICP's argument that Hoeft wore his Ziegler "hat" for purposes of his communications with IronPlanet). Thus, ICP's enumeration is meritless.

are headed if anywhere with ICP." He warned that, "[u]ntil [they] have a statement . . . Thompson is in the holding pattern with us." Jeter, in response, stated, "Our deal with ICP has been terminated and removed from the IronPlanet website." Jeter's email was then forwarded to Thompson officials by Frank Langham of IronPlanet. Lindley requested "a [W]ord document on IronPlanet letterhead with [that] statement" with Jeter's "name and title at the end." IronPlanet complied. Nothing in those communications, or the resulting statement from IronPlanet, constitutes direct evidence of a conspiracy among the Defendants. There is not even a single mention of another dealer or entity in those communications, and the communications simply do not establish that Thompson unlawfully conspired with anyone to restrain trade. Additionally, these emails are simply requests for information about an arguably industry-changing event that do not support the existence of the alleged conspiracy.

As to Ring Power,[15] ICP points to the following: (1) internal Ring Power emails regarding the "concerns" about the IronPlanet-ICP deal harbored by Ring Power executives and the

---

[15] ICP seemingly concedes that there is no direct evidence tying Ring Power to the conspiracy, stating in its opening brief that "[b]ased on record evidence, a reasonable jury could also conclude that Ring Power played a key role in coordinating and leading the conspiracy," and that there is "more than enough evidence from [which] a jury could *reasonably infer* Ring Power's involvement in the conspiracy." Irrespective of ICP's concession, however, we will consider whether the proffered evidence implicating Ring Power constitutes direct evidence of a conspiracy.

communication of those concerns to Caterpillar; and (2) "a flurry of phone calls" between Ring Power's Fowler and officials at Caterpillar, Thompson, and IronPlanet following Fowler's email to Ring Power's CEO informing him of the IronPlanet-ICP deal. Neither of these pieces of evidence is direct evidence of a conspiracy. Emails internal to Ring Power containing no mention of any other Defendant (much less an agreement between them to boycott IronPlanet) do not show the existence of an illegal conspiracy to restrain trade. Nor does a series of phone calls: a factfinder would be required to make an inference that the phone calls were, indeed, concerning not only the IronPlanet-ICP deal, but also an agreement between Ring Power and Thompson, in order to conclude that there was a conspiracy between those Defendants. The phone calls are therefore plainly not direct evidence of such a conspiracy.

Accordingly, ICP has failed to put forth any direct evidence proving that Defendants conspired to boycott IronPlanet until it terminated its relationship with ICP.

### 2. Circumstantial Evidence with Plus Factors

In its reply brief, ICP asserts for the first time that the evidence it initially argued was direct evidence of a conspiracy is also circumstantial evidence of such. Thus, ICP also needs to show the existence of plus factors. But ICP tacitly admits that it has not done so. Instead, ICP argues that, under *DeLong*, it is not limited to a "two-track" requirement of *either* direct evidence *or* circumstantial evidence and plus factors; it contends that "antitrust

plaintiffs may rely on the cumulative weight of various kinds of evidence, including that which requires interpretation or inferences, even without a showing of 'parallel conduct.'"

*DeLong*, however, does not hold that the cumulative weight of the evidence (without plus factors) can get a plaintiff past summary judgment in an antitrust case. In *DeLong*, we considered a plaintiff's claims of vertical price conspiracy and concluded that by "[v]iewing the totality of the evidence . . . , a jury reasonably could conclude that [the defendants] worked together to develop" a competing product "and agreed to sell it at an inflated price," *i.e.*, the evidence "all reasonably tend[ed] to support [the plaintiff's] conspiracy allegation." 887 F.2d at 1511–12. While it is true that we did not explicitly consider any "plus factors," we did state that evidence of parallel conduct "need not be such that *only* an inference of conspiracy may be derived from it," but instead, "[i]t must . . . tend to exclude the inference of independent action." *Id.* at 1509. This holding—which plainly states that inferences are not enough at summary judgment—is not inconsistent with our requirement of plus factors discussed in other cases. Indeed, prior to our decision in *DeLong*, we held in *Dunnivant v. Bi-State Auto Parts* that "[i]n order to avoid a motion for summary judgment, a plaintiff must come forward with significant probative evidence supporting its theory of conscious parallelism with some 'plus' factor which tends to indicate the absence of independent action." 851 F.2d

1575, 1583 (11th Cir. 1988).[16] And after *DeLong,* we have confirmed the need for plus factors in a circumstantial evidence case: "To ensure that we do not punish unilateral conduct, . . . we require more than mere evidence of parallel conduct by competitors to support an inference of a conspiracy; an agreement is properly inferred from conscious parallelism only when 'plus factors' exist." *Todorov,* 921 F.2d at 1456 n.30. *DeLong* does not require otherwise or hold to the contrary. ICP cannot preclude summary judgment by reliance on circumstantial evidence alone, without any discussion or argument of plus factors because "[m]ere equipoise of the evidence does not establish an agreement." *Am. Contractors,* 989 F.3d at 1234.

Even considering all of the purported direct evidence as circumstantial evidence, nothing permits the inference that Defendants illegally conspired to boycott IronPlanet in an effort to thwart the IronPlanet-ICP deal. And even if the circumstantial evidence permitted such an inference, ICP has failed to put forth any plus factors that bring its evidence out of the realm of equipoise. ICP has only made the conclusory argument that the alleged conspiracy was economically rational for Defendants. At most, ICP has put forth evidence tending to show that Defendants

---

[16] Under our "prior panel precedent rule," we are required to follow the precedent of the first panel to address the relevant issue, "unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). Thus, if any conflict did exist between *DeLong* and *Dunnivant,* our holding and reasoning in *Dunnivant* would win the day.

independently harbored concerns about the effects the IronPlanet-ICP deal would have on the heavy construction equipment industry and their own respective businesses, and communicated those concerns to IronPlanet in the form of requests for additional information. That conduct is not illegal under the Sherman Act.

Because ICP has not pointed to direct evidence of a conspiracy or to circumstantial evidence with additional plus factors that would permit the inference that Defendants acted in concert rather than independently, its Sherman Act claims fail. The district court did not err in granting Defendants summary judgment on these claims.

## B. Tortious interference with contract

ICP advanced two causes of action for tortious interference with contract under state law for (1) lost profits and (2) damaged equity and goodwill. The district court granted Defendants summary judgment on those claims because it concluded that there was no evidence from which a jury could find that Defendants intentionally and unjustifiably interfered with "the business relationship between" ICP and IronPlanet or induced IronPlanet to breach its agreement with ICP.[17]

First, as to Ring Power, the district court found that "the summary judgment evidence fail[ed] to show that Ring Power

---

[17] The district court used the phrase "business relationship" twice in its summary judgment order but analyzed ICP's claims under the correct framework for tortious interference with contract.

threatened to boycott IronPlanet," because it issued "nothing more than inquiries" into the IronPlanet-ICP relationship.  It concluded that the record evidence showed that Ring Power's inquiries did not contain or imply any threat of a boycott, nor did IronPlanet perceive any of the inquiries as a threat of a boycott.

Second, the district court found that the same was true for Thompson, determining that even if Thompson's request for confirmation from IronPlanet that it had terminated the deal with ICP was a "veiled threat," such a "threat would not be actionable because Thompson was justified in not dealing (or threatening not to deal) with IronPlanet under the circumstances" according to the commentary to § 766 of the Restatement (Second) of Torts.  It also held that Thompson "was motivated by its legitimate business interests," *i.e.*, "that its used equipment would sell for less," and thus was entitled to summary judgment.

Lastly, as to Ziegler, the district court concluded that even assuming that Hoeft's email to IronPlanet inquiring about the ICP relationship was sent on behalf of Ziegler rather than CAS, and further assuming that the email contained or implied a threat to boycott IronPlanet, the claims would still not be actionable because "Ziegler, like Thompson, was free to independently decide who to deal with based on its own business interests."

ICP argues that the district court erroneously determined that no Defendant threatened to boycott IronPlanet because "there is evidence from which a reasonable jury could find that IronPlanet terminated its ICP contract under pressure from dealers, and

specifically in response to threats to its merger plans and its equipment consignments." It also argues that § 766 to the Restatement "draws a contrast between a refusal to deal motivated by an 'aversion' to a third party, and a refusal to deal (or threat of such refusal) that is accompanied by statements or signals actively seeking the cancellation of a contract with a third party." Because Defendants "moved beyond refraining from business based on an 'aversion,'" their purported threats constituted unjustifiable interference.

ICP also contends that the district court erroneously relied on Florida law's "privilege to interfere" which protects actions taken to promote one's own economic self-interest; ICP argues that the privilege does not apply where improper means are employed, such as threats and intimidation. ICP contends that Defendants' "concerted pressure campaign" qualifies as improper means. Lastly, ICP argues that "[t]he district court usurped the jury's role" in determining whether Defendants' alleged interference was improper.

Under Florida law,[18] "[t]he tort of contractual interference occurs when: [1] a contract exists; [2] the third-party has knowledge of the contract; [3] the third party intentionally interferes with a party's rights under the contract; [4] there is no justification or

---

[18] The parties do not agree on which state's laws apply in this case—North Carolina, Illinois, or Florida. However, the parties have agreed that there is no meaningful difference between the three states' tortious interference laws. The district court applied Florida law, so we will do the same here.

22-10231                Opinion of the Court                27

privilege for the interference; and [5] there are damages." *Mariscotti v. Merco Grp. At Akoya, Inc.*, 917 So. 2d 890, 892 (Fla. 3d DCA 2005). We focus on the third and fourth elements here: whether there was an unjustifiable interference by Defendants into ICP's agreement with IronPlanet. *See, e.g.*, *Cedar Hills Properties Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991) ("In order to maintain an action for tortious interference with contractual rights, a plaintiff must prove that a third party interfered with a contract by influencing, inducing or coercing one of the parties to breach the contract, thereby causing injury to the other party." (quotation omitted and alteration adopted)); *Stutzke v. D.G.C. Liquidation Co.*, 533 So. 2d 897, 899 (Fla. 4th DCA 1988) ("A cause of action for tortious interference requires that there be direct, intentional interference.").

The Restatement (Second) of Torts § 766[19] explains that, with respect to the "means of interference," "[t]here is no technical requirement as to the kind of conduct that may result in interference," but notes that "[t]he interference is often by

---

[19] Section 766 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

inducement . . . conveying to the third person the actor's desire to influence him not to deal with the other."  Restatement (Second) of Torts § 766 cmt. k.

However, there are certain justifications for interference, including refusing to deal.  Again, the commentary to § 766 provides guidance on when an individual or entity's refusal to deal with a third party constitutes an unjustifiable interference with the third party's business relationship with the plaintiff:

> A refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person.  Thus A may induce B to break his contract with C by threatening not to enter into, or to sever, business relations with B unless B does break the contract.  This situation frequently presents a nice question of fact.  *While, under the rule stated in this Section, A may not, without some justification induce B to break his contract with C, A is ordinarily free to refuse to deal with B for any reason or no reason.*  The difficult question of fact presented in this situation is whether A is merely exercising his freedom to select the persons with whom he will do business or is inducing B not to perform his contract with C.  That freedom is not restricted by the relationship between B and C; and *A's aversion to C is as legitimate a reason for his refusal to deal with B as his aversion to B.*  If he is merely exercising that freedom, he is not liable to C for the harm caused by B's choice not to lose A's business for the sake of getting C's.

On the other hand, if A, instead of merely refusing to deal with B and leaving B to make his own decision on what to do about it, goes further and uses his own refusal to deal or the threat of it as a means of affirmative inducement, compulsion or pressure to make B break his contract with C, he may be acting improperly and subject to liability under the rule stated in this Section.

Restatement (Second) of Torts § 766 cmt. *l* (emphasis added).

Under Florida law, "there can be no claim [for tortious interference] where the action complained of is undertaken to safeguard or promote one's financial or economic interest." *Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d DCA 1986). Further, "[i]f a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable." *Heavener, Ogier Servs., Inc. v. R. W. Fla. Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982); *see also id.* ("Even if the contract is terminable at will, the interferer's actions are tortious and actionable if the motive is purely malicious and not coupled with any legitimate competitive economic interest."). Moreover, a defendant may not utilize improper means, such as threats, intimidation, or conspiratorial conduct, and still enjoy the privilege of business competition. *See Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (collecting cases); *see also Sec. Title Guarantee Corp. of Baltimore v. McDill*

*Columbus Corp.*, 543 So. 2d 852, 855 (Fla. 2d DCA 1989) ("[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial interests are entirely non-actionable.").

### 1. Ring Power

We turn first to ICP's argument that Ring Power threatened to boycott IronPlanet and thus intentionally interfered with ICP's relationship with IronPlanet. ICP, however, has not cited to any evidence from which a jury could reasonably infer that Ring Power interfered with its IronPlanet deal, either in its opening brief or in its reply brief. Rather, it rests its arguments on evidence that, at most, indicates that Ring Power was concerned about the IronPlanet-ICP deal and that Ring Power's Fowler "engaged in a flurry of phone calls with officials at Caterpillar, Thompson, and IronPlanet." ICP has not pointed to any evidence that Ring Power took any action to threaten or pressure IronPlanet to terminate its deal with ICP and thus has not created a genuine issue of material fact on the third element of tortious interference with contract under Florida law. *Tamiami Trail*, 463 So.2d at 1127. Therefore, Ring Power is entitled to summary judgment on the tortious interference with contract claims.

### 2. Thompson

We turn next to Thompson. ICP relies upon the communications between Thompson's Lindley and IronPlanet as evidence of intentional interference in which IronPlanet expressed concern internally that it would be in a "holding pattern" with

Thompson while the ICP deal remained intact and in which Thompson requested a formal statement on IronPlanet letterhead that the ICP deal had been terminated. We agree with the district court that nothing in those communications could be reasonably construed as a threat of boycott and thus cannot satisfy the third element of tortious interference under Florida law. *Id.*

However, even if they could be so construed, Thompson's actions would be justified under § 766 cmt. *l* to the Restatement (Second) of Torts, which provides:

> A may induce B to break his contract with C by threatening not to enter into, or to sever, business relations with B unless B does break the contract [with C]. . . . A may not, without some justification induce B to break his contract with C, [but] A is ordinarily free to refuse to deal with B for any reason or no reason[, and] A's aversion to C is as legitimate a reason for his refusal to deal with B as his aversion to B.

Restatement (Second) of Torts § 766 cmt. *l*. In other words, we are presented with the precise scenario contemplated by the Restatement: Thompson's aversion to ICP is "a legitimate reason for [its] refusal to deal" with IronPlanet. *Id.*; *Heavener*, 418 So.2d at 1076; *Genet*, 498 So.2d at 684. While ICP contends that Thompson went "beyond" a mere refusal to deal by "actively seeking cancellation of a contract with a third party," *i.e.*, affirmatively inducing a breach of contract, the communications did no such thing, as evidenced by the fact that they did not take place until

several days after ICP's products had been removed from IronPlanet's website and IronPlanet officials informed ICP of the termination. We agree with the district court that the evidence showed that Thompson acted primarily to protect its business interests, and thus any interference was justified. Because Thompson's refusal to deal was justified, it is entitled to summary judgment on these claims.

### 3. Ziegler

Lastly, with respect to Ziegler, even assuming that Hoeft's email to IronPlanet was sent on behalf of Ziegler rather than CAS, we agree with the district court that the email did not contain any threat of boycott, it could not have been construed as a threat to boycott, and it was not received or understood by IronPlanet to be a threat of boycott, evidenced by Jeter's testimony that he did not receive any threats from Defendants. And even if Hoeft's email were to be construed as a threat, it would not be actionable as interference because Ziegler, like Thompson, was entitled to refuse to deal with IronPlanet while IronPlanet was engaged with ICP based upon its own business interests. Restatement (Second) of Torts § 766 cmt. *l*; *Heavener*, 418 So. 2d at 1076; *Genet*, 498 So. 2d at 684. For that reason, Ziegler is also entitled to summary judgment on ICP's tortious interference claims.

### III.    Conclusion

ICP has failed to carry its burden on summary judgment on its claims arising under § 1 of the Sherman Act as well as its state-law claims for tortious interference with contract. ICP has not put

forth sufficient evidence to permit a reasonable jury to infer that Defendants acted in concert in conspiring to boycott IronPlanet if it did not terminate its relationship with ICP and therefore its § 1 claims must fail.  ICP has also failed to put forth sufficient evidence to preclude summary judgment on its state-law tortious interference claims.  Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**